EXHIBIT A

```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2
    --------------------------------------x
 3  CAP 111 ENTERPRISES, LLC,

 4                          Plaintiff(s),

 5                                    22 CV 1408 (CS)(AEK)
        -vs-
 6                                    DISCOVERY CONFERENCE

 7

    MANHATTAN BEER DISTRIBUTORS, LLC, et al.,
 8
                            Defendant(s).
 9  --------------------------------------x

10
        *Proceedings recorded via digital recording device*
11

12                              United States Courthouse
                                White Plains, New York
13
                                Wednesday, August 16, 2023
14

15  Before:  THE HONORABLE ANDREW E. KRAUSE,
                            Magistrate Judge
16

17  A P P E A R A N C E S:

18

    WITTELS McINTURFF PALIKOVIC
19      Attorneys for Class Plaintiffs
    BY:  STEVEN L. WITTELS
20       J. BURKETT McINTURFF

21
    DAVIDOFF, HUTCHER & CITRON, LLP
22      Attorneys for Defendant
    BY:  PETER M. RIPIN
23       ERIC J. PRZYBYLKO

24

25
```

1          THE DEPUTY CLERK:  Good morning, all.  This is the

2    matter of Cap 111 Enterprises, LLC v. Manhattan Beer

3    Distributors, docket no. 22 cv 1408.  The Honorable Andrew

4    Krause presiding.

5          Counsel, note your appearance for the record, starting

6    with Plaintiff's counsel.

7          MR. WITTELS:  Steven Wittels, Wittels, McInturff &

8    Palikovic, for Plaintiffs and the proposed class.

9          Good morning, your Honor.

10         THE COURT:  Good morning, Mr. Wittels.

11         MR. McINTURFF:  Good morning, your Honor.  Burkett

12   McInturff for Plaintiffs in the proposed class.

13         THE COURT:  Good morning, Mr. McInturff.

14         MR. RIPIN:  Good morning, your Honor.  Peter Ripin for

15   the Defendants.

16         THE COURT:  Good morning, Mr. Ripin.

17         MR. PRZYBYLKO:  Eric Przybylko, also for Defendants.

18         THE COURT:  Good morning, Mr. Przybylko.

19         MR. PRZYBYLKO:  Good morning.

20         THE COURT:  All right, we're here for a discovery

21   conference.  We have a number of issues to work through.  I've

22   reviewed all of the submissions.  We'll identify the relevant

23   letters for each dispute as we get to them one by one.

24         I will say that I am aware that there is still an

25   outstanding issue from our last discovery conference with

1 respect to the appropriate date range for production of database

2 data.  That was the issue identified at ECF nos. 90, 106, 107,

3 and 109.  I've seen on the docket that Judge Seibel intends to

4 rule on the motion to dismiss later this month, and there are a

5 lot of overlapping arguments between that particular discovery

6 issue and the motion to dismiss.

7          I understand Plaintiff's position is regardless the

8 outcome of the motion to dismiss, the items should be

9 discoverable anyway, and that's fine, but I have a concern about

10 inconsistency between whatever I might find on the discovery

11 issue and whatever Judge Seibel might find on the motion to

12 dismiss, and since that motion is to be decided quite soon, I'm

13 going to reserve decision or continue to reserve decision on

14 that one issue until after the motion to dismiss is decided.

15          Again, it may not be the final determinative word on

16 exactly whether that material is discoverable or not, but there

17 are, again, overlapping arguments about certain key legal

18 issues, and I don't want to muddy the record here by making a

19 ruling on those issues two weeks before Judge Seibel's going to

20 rule on the motion to dismiss.  She and I don't confer or

21 consult about these things, because that would not really be

22 appropriate in, in this context when the matter's referred for

23 general pre-trial supervision while a motion to dismiss is

24 pending.  That doesn't happen all that often, frankly.  I

25 understand why it did happen in this case and it makes good

1  sense that we've been working through discovery even while the

2  motion is pending, but I'm going to hold off on ruling on that

3  issue until after the decision on the motion to dismiss, so

4  we'll go through and resolve the other issues today, or at least

5  I expect to be able to resolve all the other issues today, but

6  that one I'm going to continue to hold on to.  Okay?

7          I'm sorry, I'm just trying to pull up the docket here

8  because I may need to refer to that during the course of our

9  conference, and for some reason...I'm having difficulty with

10  that.  But we'll start with the first issue, which is -- well,

11  let me just -- before I -- we get to that, since our last

12  conference, I did see that the parties had filed the stipulation

13  dismissing a number of the restaurant plaintiffs from this

14  lawsuit.  That was at ECF no. 115.  I don't think that has any

15  bearing on any of the outstanding discovery questions other than

16  perhaps to the extent there were requests directed at those

17  plaintiffs, which are now irrelevant, but I just wanted to

18  confirm that before we moved on.

19          Mr. McInturff.

20          MR. McINTURFF:  No, your Honor, your Honor's correct.

21          THE COURT:  Okay.

22          Mr. Przybylko?  Mr. Ripin?

23          MR. RIPIN:  We agree.

24          THE COURT:  All right, and then there was another

25  stipulation, which I signed, regarding what identifying customer

Case 7:22-cv-01408-CS-AEK   Document 168-1   Filed 05/01/24   Page 6 of 98

Disc. Conf.                Cap 111 v. Manhattan Beer                        5

1  information needed to be produced through discovery that seemed

2  fairly routine.  I don't think there's anything we need to

3  discuss about that.

4          So the first dispute was raised by Defendants at ECF

5  no. 119, plaintiff's response is at ECF no. 124, and this has to

6  do with personal email accounts for four custodians that the --

7  what are referred to as the Village Social Plaintiffs have

8  identified as having relevant information or at least at one

9  point were identified in that way.

10         In terms of the accounts, I understand the parties'

11  positions that the accounts -- the specific accounts were

12  identified in response to Defendants' interrogatories and there

13  is language in the ESI protocol about personal email accounts,

14  Hotmail accounts, Gmail accounts, AOL accounts, potentially

15  being sources of relevant ESI material.

16         So I understand that as the background in terms of

17  where the request came from for these accounts, but I understand

18  the Plaintiffs' position is that they've conducted some searches

19  and determined essentially that everything that was coming up in

20  their review of those materials was not responsive or irrelevant

21  and -- or both and that it's therefore burdensome to continue to

22  review the material from these accounts using the search terms

23  that were agreed to because it's not likely to generate any

24  non-duplicative information that will be proportional to the

25  needs of the case or relevant, really, in the...in response to

1 these particular inquiries, and part of the argument, as I

2 understand it, from the Plaintiffs is that there are other

3 sources of ESI for these particular plaintiffs or these

4 particular businesses, maybe not these particular individuals,

5 so I have that as the background.

6         And I will say, Mr. Przybylko, what I guess I'm trying

7 to understand is whether it's the Defendants' position that

8 Plaintiffs have committed to reviewing materials from these

9 particular accounts and producing them regardless of any

10 preliminary assessment as to the likelihood of discoverable

11 material to come from the accounts?  Because I will just say,

12 and you can address this, I find somewhat compelling the point

13 that ordinarily defendants -- well, I shouldn't say.  The party

14 responding to the discovery request identifies where the

15 materials are likely to be found and productions are made from

16 those accounts, and as discovery progresses, if it becomes clear

17 that there are other courts that should be searched, sometimes

18 that has to happen.

19         Now, I also understand that you all have worked very

20 hard and, and have gone through a lengthy iterative process to

21 try to avoid the, the need for repetitive searches down the

22 line, to try to get all of the ESI done up front and then move

23 to the depositions, which is commendable, but often not really

24 achievable, in the sense that you can actually get it all sorted

25 in advance, so, again, that's, that's kind of where I'm coming

1 at this one so far based on the letters.

2          So let me turn to you, Mr. Przybylko.

3          MR. PRZYBYLKO:  No, your Honor, I appreciate that,

4 although I will say that when you hear what actually happened,

5 you may have a different view of what Plaintiffs are actually

6 trying to do.

7          The issue, really, is that the parties spent several

8 weeks, if not months, negotiating an ESI protocol that was

9 largely based on a model Plaintiffs themselves insisted on, and

10 it provides very specifically for not only the identification of

11 potentially relevant and discoverable sources of ESI, but how

12 those sources would then be collected, forensically searched,

13 how the search terms would be refined, and the whole point of

14 that is to make sure that if there's anything there, we do get

15 to it in a manner that is transparent and is cooperative, that

16 we've had a say in it.

17          They agreed to that, they identified these four email

18 accounts as containing relevant and discoverable ESI, and then

19 on the very date that we were to exchange initial proposed

20 search terms, they basically changed course and said "we've

21 changed our mind," and the reason why initially they said was

22 because we could not locate any responsive documents in these

23 four accounts.

24          Now, that could be true, but we said let's meet and

25 confer, and the first thing we learned is they didn't even look

1  into those four accounts, and they now admit that.  For two of

2  the custodians, they never had access, they never did any subset

3  searches; they simply claimed based on further custodial

4  interviews, they determined that it would not be proportional to

5  collect them.

6        Now, they refused to give us any further information,

7  so now we are deprived of the transparent and cooperative

8  process we all agreed to, and to make matters more troublesome,

9  they refuse to give us any information about the nature of what

10 changed for those two, what they learned in these custodial

11 interviews.  The only thing they would say is they said they

12 didn't use those email accounts to conduct business with

13 Manhattan Beer.

14       Now, number one, if they were going solely off of a

15 representation of the custodians with no further inquiry, I

16 respectfully submit that does not satisfy their discovery

17 burden, but more problematically, if that's the question they

18 asked, our requests are not limited to dealings with Manhattan

19 Beer specifically, there are dozens of requests that don't

20 relate to Manhattan Beer, and I have no way of knowing if

21 they've asked the right questions.

22       Moving to the other two and, frankly, more important

23 custodians, the two Bueti brothers, one of whom is the owner of

24 the entire restaurant group, they are claiming that they ran

25 searches, quote, broader than either their or our search terms,

1  and that is simply a false statement.  They didn't even run

2  their own search terms in their entirety.  There are search

3  terms on their list they just didn't run, and when we said why

4  is that, they said we won't tell you.  And for them to suggest

5  that they ran search terms broader than ours is particularly

6  incredible because they didn't have our search terms when they

7  ran these searches in secret.  They gave them dozens of search

8  terms they did not search, so they simply do not have the right

9  to unilaterally reverse-engineer a justification to not collect

10  these very email accounts that they claim contain relevant

11  information.

12          And on that point, by the way, during

13  meet-and-confers, they expressly told us we are not claiming

14  there is no relevant, discoverable material in these four

15  accounts, we're only claiming it wouldn't be proportional to

16  collect it.  And that's a very important distinction, because

17  once you move to proportionality, the only two proportionality

18  factors they could point to to justify that statement were

19  privacy, which was their number one argument, and expense.

20          Privacy, I think they concede, clearly falls away

21  because they spend all but a sentence in their lettering

22  addressing it, and there's a good reason for that --

23          THE COURT:  I get the point.

24          MR. PRZYBYLKO:  Okay.

25          THE COURT:  I'm not persuaded that privacy is much

1  issue when the Plaintiffs' lawyers would review all the material

2  first.

3       MR. PRZYBYLKO:  Exactly.  And on the burden point, we

4  said to them, if you claim it's too expensive to forensically

5  collect these and process them for searching, how much did your

6  consultant tell you that would cost, and they said, you know

7  what, we didn't ask.  And that one, they're --

8       THE COURT:  And they say, look, it's not just the

9  consultant time, it's the review time...I mean, it's --

10 proportionality is more than that.

11      MR. PRZYBYLKO:  Right, but, your Honor, the fight --

12 the part of this process we're fighting about is simply the

13 collection if what they're point -- first of all, they've taken

14 --

15      THE COURT:  I understand the point.  If you might

16 refine it down to the point where the review time isn't that

17 burdensome, if you narrow the search terms, if there are terms

18 that are coming up with too many hits, and that's kind of the

19 purpose of the, the process.

20      MR. PRZYBYLKO:  Right.  I mean, there are search terms

21 we have given them that they didn't search that they admit

22 they'll search for other custodians, but they're going to sit

23 there and say they don't have to search them for these -- it's

24 just not a logical...position.

25      They agreed for custodians they identified to take

1   these steps so that we could all go through this process in a

2   way, like I said, that is transparent and cooperative.  They

3   have not demonstrated why they were entitled to unilaterally

4   ignore that ESI protocol.

5               THE COURT:  Okay.

6               Mr. McInturff.

7               MR. McINTURFF:  Thank you, your Honor.

8               Just for the record, I don't agree with defense

9   counsel's characterizations of our conduct at the

10  meet-and-confers and I don't think that that's helpful, but the

11  overriding point here is we've taken an incredibly broad

12  approach to ESI discovery.  We're looking now at producing,

13  reviewing, between -- somewhere between 2,000 and 8,000

14  documents for the Plaintiffs in this case.  Historically

15  speaking, cases like this in our firm, we've reviewed, you know,

16  a couple dozen documents, so we're taking an incredibly broad

17  approach for these specific Plaintiffs we've identified as

18  custodians.

19              The comptroller of the restaurant group, who is also

20  the chief compliance officer, and that person is the one that

21  pays all of the Manhattan Beer bills, and we've collected that

22  person's email account.  All bills for the group go through that

23  person.  We've also collected their direct reports' email

24  account.

25              THE COURT:  I'm sorry, the comptroller's direct

1   reports?

2          MR. McINTURFF:  Correct.

3          We've also -- furthering our custodial interviews, we

4   collected the email accounts of two different restaurant

5   managers.

6          The four individuals that we de-designated as

7   custodians, for two of them, we did custodial interviews and

8   were told -- you know, these were reasonable and extensive

9   interviews and we were told that these email accounts did not

10  like -- were not likely to contain discoverable information.

11  Based on the results of those interviews, we concluded that it

12  did not make sense to collect those email accounts.

13         As your Honor has observed, if further discovery

14  reveals that those email accounts contain unique e-mails, we can

15  revisit the issue, but at this time, it is, it is well settled

16  that it is our decision as to how to designate custodians.  We

17  took a very broad approach initially.  We did further custodial

18  interviews and found out that these -- for these two email

19  accounts, for Ms. Conveniencia and Mr. Jarro, that they simply

20  were not using the email accounts in ways that were likely to

21  produce responsive discovery.

22         THE COURT:  And on that point, Mr. Przybylko, one of

23  the concerns that he raises there is that you represented that

24  these individuals said that they didn't use these accounts for

25  communications with Manhattan Beer.  Regardless of what you said

Case 7:22-cv-01408-CS-AEK   Document 168-1   Filed 05/01/24   Page 14 of 98

Disc. Conf.          Cap 111 v. Manhattan Beer                    13

1  or didn't say then, what is your position now with respect to

2  what these witnesses or these potential custodians explained to

3  you about how they used these e-mail accounts?  Was that

4  questioning limited to their communications with Manhattan Beer?

5           MR. McINTURFF:  No.  Absolutely not.

6           THE COURT:  Okay.

7           MR. McINTURFF:  It wasn't, your Honor.

8           THE COURT:  And so they have represented to you that,

9  and without waiving privilege or anything like that, but they

10 have represented to you that they didn't use these e-mail

11 accounts for business purposes at all?  Or something narrower.

12          MR. McINTURFF:  Something narrower.  We did extensive

13 interviews about their use of the e-mail accounts and they told

14 us what they used them for, and those uses were well, well

15 outside of the purview of anything remotely responsive to this

16 case, so we made the conclusion, preliminarily, not to collect

17 those e-mail accounts.  If, if discovery reveals otherwise, we

18 can revisit the issue.

19          THE COURT:  And remind me of those individuals' roles

20 at the Plaintiff businesses.

21          MR. McINTURFF:  So Ms. Conveniencia is the assistant

22 manager at the Mount Kisco location, and we have -- we've

23 collected the e-mails of her manager, and then Mr. Jarro is the

24 manager at the Pub Street location.

25          THE COURT:  Okay.

1          MR. WITTELS:  And, Judge, just to jump in, the man --

2    if I may...

3          THE COURT:  Sure.

4          MR. WITTELS:  The manager is Brandon Haug, so we have

5    --

6          THE COURT:  I'm sorry, is Brandon whom?

7          MR. WITTELS:  Haug I think it is, H-A-U-G, and we

8    collected his -- all of his e-mails.

9          THE COURT:  He's the manager at the Mount Kisco

10   location?

11         MR. WITTELS:  Right, so we have -- you know, he's the

12   one who supervises her.

13         MR. McINTURFF:  But more critically, we've got the

14   e-mails of the comptroller and the chief compliance officer were

15   these receipts and invoices go.  That's the, that's the source

16   of the payments in exchange and the money.  So we've collected

17   that e-mail account, we're searching it, and we think that that

18   is reasonable.  We don't think that our early identification of

19   a custodian estops us from conducting further interviews and

20   then making a determination based on our interviews that the

21   collection of additional e-mail accounts is not proportional to

22   the needs of the case.

23         THE COURT:  Okay, so in those two instances, you

24   didn't collect the accounts at all --

25         MR. McINTURFF:  Right.

1           THE COURT:  -- so you didn't run search terms, we have

2    no idea what the scope or volume or proportionality issues would

3    be, it would -- that's purely a relevance argument as to those

4    two custodians.  I mean, it's proportionality in that because

5    you believe that it's entirely irrelevant, it's therefore not

6    proportional, but...

7           MR. McINTURFF:  Yeah.

8           THE COURT:  But you haven't really examined what the

9    volume of potential review would be if you were to collect those

10   custodians' accounts and run the search terms.

11          MR. McINTURFF:  We have a good sense because of -- we

12   did collect for four other custodians, and we took a

13   conservative approach because we, we did collect another

14   personal e-mail account, which is much, much bigger than the

15   business accounts, for a different plaintiff, but assuming the,

16   the -- these personal e-mail accounts are the same size as the

17   business e-mail accounts that we collected, that -- the review

18   burden, essentially it would be an additional fifty percent for

19   these two custodians and based on our math.

20          THE COURT:  Right, I mean, assuming that the accounts

21   are of a particular size and assuming the terms hit at a similar

22   rate, so you don't really know, you're making those assumptions

23   based on the information that you have from other individuals

24   who may have used their personal accounts differently, they may

25   have engaged in a larger volume of communication, whether

1  business or personal, so, I mean, the thing about personal

2  accounts as compared to business accounts is it's a little bit

3  harder to extrapolate from one to the next because people use

4  their personal accounts in all different kinds of ways, but,

5  nevertheless, I understand the scope of that.

6          And with respect to the other two, the -- Mr. and Mr.

7  Bueti, B-U-E-T-I.

8          MR. McINTURFF:  So my col --

9          MR. WITTELS:  Mr. and Mr.

10          THE COURT:  That's what I said.

11          MR. WITTELS:  Oh, I thought you said Mrs.  I

12  apologize.

13          MR. McINTURFF:  My colleague, Mr. Wittels, went and

14  ran searches.  We dispute that -- Defendants' claims that those

15  searches were narrower than --

16          THE COURT:  Okay, so just tell me the searches you did

17  run.

18          MR. McINTURFF:  So the searches that were run are

19  listed in footnote 2 of the Defendants' letter motion at ECF

20  119.

21          THE COURT:  Okay, but I -- that -- I see that, but I

22  don't understand how that relates exactly to the terms that they

23  think you should have run or that you had agreed to run or

24  whatever else.  Those are the terms that you ran, the ones that

25  Defendants list in footnote 2 --

1          MR. McINTURFF:  Correct.

2          THE COURT:  -- at ECF no. 119.

3          MR. McINTURFF:  And, and those were broader, those,

4   those encompass a broader subject area of terms than what the

5   Defendants had proposed at the time, so --

6          THE COURT:  What makes you say that?  Because Mr.

7   Przybylko obviously doesn't agree with that description.

8          MR. McINTURFF:  If we look at the Defendants' terms...

9          MR. PRZYBYLKO:  Which were not even proposed at the

10  time they ran the searches.  They didn't have those -- our terms

11  at the time they ran the searches.

12         THE COURT:  Okay, and -- but let's just -- fine.  I

13  understand that, Mr. Przybylko.

14         These terms that you ran, how did you come up with

15  this set of terms, Mr. McInturff?  Or Mr. Wittels.

16         MR. WITTELS:  Well, yes, your Honor, we, we wanted to

17  know, as is our duty, whether they -- these two custodians had

18  any interactions that were responsive to the requests, so we

19  went as broadly as we could starting with Manhattan Beer, M

20  Beer, Manhattan Beer not --

21         THE COURT:  I see the terms, I just --

22         MR. WITTELS:  That --

23         THE COURT:  Hold on.  What I don't understand is the,

24  the sequence of events and why...heh, if the whole purpose of

25  the ESI protocol and these negotiations were that you'd agree on

1 some terms and then you'd run those terms, why did you run your

2 own terms?  Which you describe as broader and the Defendants

3 dispute in terms of that characterization, but why, why do it

4 that way; I don't understand.

5          MR. McINTURFF:  The -- it was the timing that was

6 built into the process where we were -- first, we were going to

7 collect ESI, so we had to make a decision at that point whether

8 or not to collect, and we decided for those two individuals to

9 run the search terms that we eventually -- essentially proposed

10 to be run on everybody's accounts down the road.  We ran search

11 terms for those individuals at that time because it was, it was

12 -- and it was before we started negotiating search terms.  We

13 couldn't, we couldn't -- we had to make the decision either to

14 collect or not collect at that point, so...

15          THE COURT:  So you ran the search terms before you

16 collected the material to --

17          MR. McINTURFF:  Correct.

18          THE COURT:  -- determine whether you thought they

19 should even be collected.

20          MR. McINTURFF:  Correct.

21          THE COURT:  Okay, and so you then collected the

22 material, but then, when the process called for you to run --

23 no?

24          MR. McINTURFF:  No, we didn't.  So we did the searches

25 on the -- these -- Mr. Wittels did the searches on the

1 individuals' computers, and based on his review, we determined

2 not to collect.

3          THE COURT:  I see, so you didn't collect for these two

4 either.

5          MR. McINTURFF:  Correct, because like with the other

6 -- the analog as to the other custodial interviews, we made a

7 determination based on a reasonable inquiry that there was

8 nothing responsive -- that we couldn't identify anything

9 responsive in the e-mail accounts and therefore we de-designated

10 them as custodians.

11          THE COURT:  Okay, you couldn't identify anything

12 responsive based on this set of terms that you ran in footnote

13 2.

14          MR. McINTURFF:  Correct.

15          THE COURT:  Of Defendants' letter.

16          MR. McINTURFF:  Correct.

17          THE COURT:  Okay.

18          And, Mr. Przybylko, how many terms -- I don't really

19 care as to this question of whether they're broader or narrower,

20 but how many terms are there in the Defendants' search term list

21 that, that you hold -- let me just take a step back.

22          MR. PRZYBYLKO:  Sure.

23          THE COURT:  Now that materials have been collected,

24 you are running these search terms that you have given to each

25 other on the collected data?  Is that correct?

1          MR. PRZYBYLKO:  Yes, so we are still in the process of

2  defining those search terms, but, yes, we have been through

3  several --

4          THE COURT:  But you're refining them based on what

5  you're finding in the, in the various runs that you're doing,

6  right?

7          MR. PRZYBYLKO:  Correct.

8          THE COURT:  Okay, so there was some initial set of

9  terms that was run against the collected material and then

10  refining is taking place to try to narrow the scope of what will

11  ultimately be reviewed for production.

12          MR. PRZYBYLKO:  That is correct.

13          THE COURT:  In other words, if these, these two

14  accounts from Mr. Bueti and Mr. Bueti were collected, had been

15  collected, then a set of terms as proposed by Defendants would

16  have been run against those accounts; yes?

17          MR. PRZYBYLKO:  Yes, and to put a finer point on it --

18          THE COURT:  Hold on, let me just make sure I

19  understand.

20          MR. PRZYBYLKO:  Sure, sure.

21          THE COURT:  And that wasn't done because those

22  accounts were not collected, but what would then happen is if

23  the volume that had been...coming up as hits based on that set

24  of terms was too voluminous from the Plaintiffs' perspective,

25  further negotiation would take place to narrow the scope, drop

1  this term, add this term, connect these terms, narrow the

2  connector, et cetera, so that a more manageable volume could be

3  arrived at.

4          MR. PRZYBYLKO:  Exactly.

5          THE COURT:  Okay.

6          So in terms of the -- all right, you were going to

7  say, Mr. Przybylko, in response to my earlier question, how many

8  terms do you have in this set of materials that would be -- that

9  would have been run had these accounts been collected?  I guess,

10 really, the question is how many terms that are not these terms

11 that are --

12         MR. PRZYBYLKO:  Sure --

13         THE COURT:  -- already listed in the footnote.  If you

14 can.

15         MR. PRZYBYLKO:  Well, I'll give you my rough count

16 based on just quickly reviewing this --

17         THE COURT:  Okay.

18         MR. PRZYBYLKO:  -- which is 22.

19         THE COURT:  Twenty-two additional terms.

20         MR. PRZYBYLKO:  Twenty-two additional terms, compared

21 to their original set of terms was one, two, three, four, five,

22 six, seven, eight, nine in total, one of which, again, you need

23 to understand, they didn't run themselves.  They didn't run it.

24 And they won't tell us why.  Which is, you know, again, part of

25 the reason why there's a transparency issue because --

1          THE COURT:  When you say -- I'm sorry, when you say

2    their original terms, we're not talking about the terms that

3    they ran in the Buetis' accounts before the collection, you're

4    talking about the original proposed terms in the protocol?

5          MR. PRZYBYLKO:  The -- no.  What I'm saying is they --

6    so that -- the way the ESI protocol work is, in the first

7    instance, and I think you even referred to this your Honor, you

8    know, Plaintiffs told us the terms based on their own knowledge

9    of their documents that they suggested should be run on their

10   collection.  We did the same.  Then we get to propose additional

11   terms, as do they.

12          So when they originally proposed the terms they said

13   they should use on their own collection, they proposed nine

14   terms.  One of those terms they didn't even run on the Buetis'

15   e-mails and they won't explain to us why, so that's a term they

16   agree is relevant and they didn't search for it.

17          THE COURT:  Okay.

18          Mr. McInturff, could you answer that narrow question?

19          MR. McINTURFF:  Yes, I can, your Honor.  What's the

20   term?

21          MR. PRZYBYLKO:  Refund, asterisk, within twenty of

22   cardboard, carrier, carton, or bottle, and I'll just point out,

23   you know, not only is 'refund' not a standalone term, but the

24   other connector terms are not standalone terms.

25          MR. McINTURFF:  Okay, no, no, but what was the

1  specific term that you said that we didn't run?

2          MR. PRZYBYLKO:  I just -- refund within twenty of

3  cardboard or carrier or carton or bottle.

4          MR. McINTURFF:  Because -- the reason we didn't run

5  that term is because we ran the term 'cardboard.'

6          MR. PRZYBYLKO:  Right, but --

7          MR. McINTURFF:  So...

8          MR. PRZYBYLKO:  -- you didn't run refund, carrier,

9  carton, or bottle.

10          THE COURT:  As standalone terms.

11          MR. McINTURFF:  As standalone terms.

12          THE COURT:  Right, there's bottle bill, there's

13  carrier charge...

14          MR. PRZYBYLKO:  Right, exactly, your Honor, but we

15  raised this point and they could have said, okay, we'll do that.

16  They just said, no, we're not going to tell you anything, this

17  is what we chose to do...there's a line in the sand.

18          THE COURT:  Okay.

19          MR. PRZYBYLKO:  And if they had done this the way they

20  were supposed to, we would at least have the visibility of, like

21  you said, numbers of hits and what are too large and what are

22  too small and we could have refined this, you know,

23  collaboratively, instead of them operating in secrecy to deny us

24  relevant ESI.

25          THE COURT:  Okay.

1          Mr. McInturff?

2          I mean, I -- the -- let me put it this way.  The

3  points with respect to Mr. Jarro and Ms. Conveniencia were they

4  were interviewed, it sounds like the interviews were more robust

5  than perhaps you understood them to be, Mr. Przybylko.

6          Go ahead.

7          MR. PRZYBYLKO:  Yeah, but there's one point I want to

8  -- he -- Mr. McInturff keeps referring to the comptroller and

9  the invoices and financial matters.  Our requests -- they have

10 agreed to respond to requests as broad as key managerial

11 people's knowledge of the bottle bill and what it provides and

12 what the deposit on a bottle is, what the deposit on a case is,

13 what other distributors were charging them.  I am not hearing

14 anything that leads me to believe they asked questions to

15 determine whether that type of ESI was in those collections.

16          THE COURT:  Okay.

17          MR. McINTURFF:  Well --

18          THE COURT:  Mr. McInturff?

19          I mean, the thing is here, you identified these people

20 as potential custodians.  That's what, that's what makes this

21 more complicated.  If you hadn't, if this were simply operating

22 in a black -- I mean, and, again, this is almost one of those

23 things where, you know, no good deed goes unpunished in the --

24          MR. McINTURFF:  Correct.

25          THE COURT:  -- sense that you all are trying to be

1  very up front and forthcoming and proactive in terms of how you

2  work through these discovery issues.

3          In a lot of cases, this issue would have never arisen

4  because Mr. Przybylko -- at least not at this stage, because Mr.

5  Przybylko and Mr. Ripin wouldn't have really known that these

6  people would have potentially been custodians worthy of

7  examination, but the fact is you identified them, which then,

8  understandably, makes Defendants curious about what prompted you

9  to identify them in the first place and then what then prompted

10 you to withdraw them.

11         It doesn't really make a whole lot of sense that you

12 would have identified them without really speaking to them and

13 then, later on, once they're now on everybody's radar screen,

14 you would withdraw them without really doing a more thorough

15 examination of what they did or didn't have, so it, it create --

16 it's a problem that in some sense you've created by identifying

17 these people, which...comes from a good place, you're trying to

18 work through these issues, but because you've done that, it, it

19 just raises questions when then you pull them out.

20         MR. WITTELS:  Well, Judge, if I may...

21         THE COURT:  Go ahead.

22         MR. WITTELS:  I had very long discussions with both of

23 these principals --

24         THE COURT:  Yeah.

25         MR. WITTELS:  -- if you will, of the company and --

Disc. Conf.          Cap 111 v. Manhattan Beer                26

1            THE COURT:  Who are you talking about now?

2            MR. WITTELS:  I'm talking about both Buetis, Joe...

3            THE COURT:  Okay.

4            MR. WITTELS:  Joseph and...

5            MR. McINTURFF:  Frank.

6            MR. WITTELS:  Frank, yeah.

7            And it wasn't just looking at their e-mails, it was,

8  okay, well, now that you've told me you had nothing responsive

9  to that, I need to see e-mails, and I sat in their offices on

10 their computers and ran these searches.  And when you run --

11           THE COURT:  Right, but then there's a question about

12 whether you ran the appropriate searches.

13           I mean, the -- I, I see a little bit of a distinction

14 between the two pairs of people here, the first two that you

15 didn't run any searches at all for even though you had

16 identified them, and the second two who you ran searches on, but

17 the searches themselves were perhaps not what they could have

18 been.  I, I see those as two distinct categories, especially

19 because with respect to Ms. Conveniencia, you...heh, you

20 captured and collected the e-mails of her supervisor, so it's

21 not as though there is a vacuum of communications from the Mount

22 Kisco location.  Mr. Przybylko.

23           I mean, the idea that you need the manager and the

24 assistant manager of a particular restaurant when the

25 representation is you have the manager and they've interviewed

Disc. Conf.          Cap 111 v. Manhattan Beer

1  the assistant manager and they've concluded that her e-mail

2  account is not...likely to lead to production of any relevant

3  materials, that one seems like a better argument on the

4  Plaintiffs' side.  For the two that you didn't collect who are

5  managers or senior people in the entire restaurant organization

6  and the terms you ran didn't even include all of the terms that

7  you proposed to run for other custodians, that leaves me with a

8  number of questions.

9          MR. McINTURFF:  Well, to be clear, though, Judge, on

10  Mr...I can't pronounce his name properly.

11          THE COURT:  Mr. Przybylko?

12          MR. McINTURFF:  Przybylko.

13          THE COURT:  It's not that complicated.

14          MR. McINTURFF:  Przybylko.

15          THE COURT:  Priz-bill-co.

16          MR. McINTURFF:  Priz-bill-co.

17          THE COURT:  Do I have that right?

18          MR. PRZYBYLKO:  You do, your Honor.

19          MR. McINTURFF:  Sorry.

20          With respect to the allegation that our terms are

21  somehow narrower, I think when you search cardboard, you are

22  pulling up anything.  With refund --

23          THE COURT:  But you're not pulling up 'refund.'

24  There's no -- the word 'refund' doesn't appear there.  It's,

25  it's a term you proposed.

Disc. Conf.          Cap 111 v. Manhattan Beer

1          MR. PRZYBYLKO:  Or 'carrier' or 'carton' or 'bottle.'

2    Or refund within twenty of any of those three terms.  I mean...

3          MR. McINTURFF:  I mean, I think, your Honor, I think

4    the larger point here that your Honor already made, which is no

5    good deed goes unpunished, and we all, we all --

6          THE COURT:  I under -- I made that point, but I --

7    it's the framework that you have agreed to and created for this

8    case, so that's what we're working within.

9          I can't pretend that these people have not been at

10   least flagged as potentially relevant, and, again, I see a

11   nuance here in terms of these four, the Buetis, I'm not sure how

12   we pronounce that name, if they were here, I'd ask them, but

13   B-U-E-T-I, those two individuals, I find the response from the

14   Plaintiffs on -- as those two much less convincing than I do as

15   to Mr. Jarro and Ms. Conveniencia.  At a minimum, it seems that

16   it would be appropriate to run the, the full set of search terms

17   that you, Plaintiffs, had proposed to run against the files or

18   the, the materials that you collected for the custodians that

19   you did agree to collect.  I mean, why not at least do that?

20   Because then you might have a more informed position to take

21   with respect to the overall level of potentially responsive

22   materials.

23          Now, I'm not sure that that really answers the entire

24   question and so there's something to be said for thinking about

25   what is most efficient, because you might do that, run this

1  additional term, and say, yep, still don't think there's

2  anything useful here, and Mr. Przybylko is still probably not

3  going to be entirely satisfied by that, so there may be

4  something to be said for just collecting those two...sets of

5  accounts and running the terms and having the negotiation that

6  you're having with respect to all of the other custodians.

7          Mr. Jarro and Ms. Conveniencia, I am not persuaded,

8  Mr. Przybylko, that those custodians are necessary here given

9  what I understand about the scope of the case.  I do understand

10 that they were identified.  I do understand that that created an

11 expectation on the defense side that you would be getting

12 materials from them.  Saying that the Plaintiffs' position with

13 respect to those parties or individuals is appropriate now

14 doesn't foreclose the possibility of seeking their documents

15 later on.  If you take those individuals' depositions and

16 determine that further discovery is necessary or when you review

17 the, the materials from Mr. Haug, H-A-U-G, the manager of the

18 Mount Kisco location, if Ms. Conveniencia is all over those

19 documents, either because she's copied or because she is

20 referenced in, in the materials to say, well, she's going to

21 follow up on this, or, make sure you speak to her about that,

22 something that gives you a reason to conclude that maybe you do

23 need those e-mails after all, then we can come back and have a

24 further conversation about it.

25          But -- so, so there, you know, the fact that custodial

1  interviews were conducted and a further refining of the

2  Plaintiffs' understanding of which accounts would have relevant

3  information was developed, that, that seems plausible,

4  reasonable, and appropriate at this stage of the litigation, but

5  with respect to the Buetis who have, as I understand it, more

6  senior managerial positions in the restaurant group and for whom

7  the position is not that those accounts don't have anything

8  remotely relevant, which is the phrase that you used, Mr.

9  McInturff, to describe the first two, and with the searches that

10 were run or this...bespoke set of terms that doesn't really

11 correspond to anything that is exactly in line with what is

12 being done for the other custodians, I, I don't really think

13 that the Plaintiffs' position there makes a whole lot of sense.

14 I don't find it to be particularly coherent.

15         Again, it may still turn out to be the case that

16 there's nothing in there that is of great utility, but, at a

17 minimum, I think it's important to run the full set of terms

18 that you would have run had you collected those materials, and I

19 think that as a practical matter, it might make sense to collect

20 those materials and run those searches and then evaluate where

21 you are in terms of what is or isn't responsive.

22         I am going to order you in the first instance to at

23 least run the search terms that, that you would have run had you

24 collected the materials and to report back to Mr. Przybylko as

25 part of this iterative process how many hits you have.  If

1  you're telling me that the collection of the data is itself

2  expensive or problematic, you know, I don't have that

3  information in front of me so I can't really evaluate that, but

4  I don't see why for those two custodians you shouldn't at least

5  go through this process of assessing what the volume is, having

6  a conversation about it, and then seeing what happens from

7  there.

8          Now, again, I...there are challenges associated with

9  reviewing and running search terms in personal e-mail accounts,

10 at least that's been my experience in a variety of settings, so

11 it may be that just collecting them in the first instance may be

12 more efficient, in which case, maybe you skip over one of these

13 sequential steps, but more needs to be done with respect to the

14 Bueti custodians.

15         I will sustain the objection with respect to -- if

16 that's really the posture at this point with respect to the

17 Jarro and Conveniencia accounts, but without prejudice to

18 renewing a request for those accounts if further information,

19 should there be more presented down the line, that warrants

20 that.

21         Mr. Przybylko.

22         MR. PRZYBYLKO:  If I can just ask a couple -- I think

23 I understand, but just one or two clarifying questions.

24         So the search terms Plaintiffs are going to be

25 required to run include our additional proposed search terms; is

Disc. Conf.          Cap 111 v. Manhattan Beer

1  that correct?  The ones we've already provided to them?

2          THE COURT:  Let me just ask that, because that's a

3  fair clarifying question.

4          If the, if the Bueti accounts had been collected, as

5  part of the ESI protocol, which terms would be run against those

6  accounts first?

7          MR. PRZYBYLKO:  There -- well...

8          MR. McINTURFF:  Well, I could answer that, your Honor.

9          MR. PRZYBYLKO:  They -- the way that --

10         THE COURT:  Well, I'm -- if you disagree.  And

11 hopefully this isn't a complicated question.  I don't think it

12 is.

13         MR. PRZYBYLKO:  No, no, a -- for the -- in the first

14 instance, the producing party ran a hit report -- when it

15 provided its initial search terms, it had a hit report, and then

16 -- but they were then entitled to run a hit report on our

17 additional terms, so we got both, just at two different times.

18         THE COURT:  They were entitled to it or --

19         MR. PRZYBYLKO:  Yes.

20         THE COURT:  -- they were required to do it.

21         MR. PRZYBYLKO:  Required.  Right.  So if we propose

22 additional search terms, regardless of how reasonable they think

23 they are, they're obligated under the ESI protocol to run a hit

24 report of those terms.

25         THE COURT:  Okay.

1           MR. McINTURFF:  Well --

2           THE COURT:  Do you agree with that description of it,

3  Mr. McInturff?

4           MR. McINTURFF:  Well, if I can clarify a little bit,

5  the -- so the terms that would have been run against the Buetis'

6  e-mail accounts had they been collected initially would have

7  been the terms listed in 124-1, and that was -- those are the

8  terms that Defense Counsel has said that -- the terms that were,

9  in fact, run were incomplete, so --

10          THE COURT:  Okay, and the ones at --

11          MR. McINTURFF:  And then after --

12          THE COURT:  Hold on.

13          MR. McINTURFF:  Sorry.

14          THE COURT:  The ones at 124-1, the search terms, and

15  you're talking about ECF 124-1...

16          MR. McINTURFF:  Correct.

17          THE COURT:  These are the Plaintiffs'...

18          MR. McINTURFF:  Initial --

19          THE COURT:  Initial terms.

20          MR. McINTURFF:  Terms, correct.

21          THE COURT:  And do you -- okay.  I think we agree on

22  that much.  But do you agree with Mr. Przybylko that if the

23  Buetis' accounts had been collected, you also would have been

24  required to run the list of Defendants' terms, which I think are

25  at 124-2 perhaps?  But let me not guess at that.

Disc. Conf.          Cap 111 v. Manhattan Beer                    34

1          MR. McINTURFF:  So we would have been required to run

2     those terms and then meet and confer on a, on a process which

3     would include if we rejected those terms, we would do a sample

4     of what was, what was recalled by the terms and then evaluate

5     the sample.

6          THE COURT:  But in the first instance, you'd run the

7     terms.

8          MR. McINTURFF:  We would run the terms.

9          THE COURT:  Okay, so I think, then, yes, the scope of

10    my order is that you should run both sets of terms.

11          And, again, this starts to beg the question of whether

12    you should just collect the accounts because, as you can tell

13    from my, my inclination as to these accounts, it seems as though

14    there may very well be a basis to move forward with including

15    them as custodians, but I'm not going to specifically order that

16    now because -- go ahead, Mr. -- well, let me finish what I'm

17    saying.

18          Because the Plaintiffs' position here is that there --

19    they have a basis for not even collecting these accounts and I

20    don't know that I know enough to agree or disagree with that,

21    and the basis for that position is that they ran search terms on

22    the account, and in part based on that and in part based on

23    their custodial interviews of Mr. Bueti and Mr. Bueti, they

24    didn't move forward with the collection.  Part of the

25    Defendants' position was that the search terms that were run

1 were inadequate to really make an appropriate determination in

2 that regard, and I agree with that and so that is why I think

3 this...middle-of-the-road solution, at least step towards a

4 solution, is warranted here given the Plaintiffs'

5 representations about what they've learned about these accounts

6 from Mr. Bueti and Mr. Bueti.

7          That said, as I have now said, I think, three

8 different ways, I'm not sure it makes a lot of sense and whether

9 it's really efficient or not to run these terms without

10 collecting the accounts because we may be back here in two or

11 three weeks with a further argument about whether the accounts

12 should be collected and we may not have a precise enough,

13 uh...set of inputs for me to evaluate that without requiring you

14 to collect them, so it may just be simpler to go ahead and

15 collect them, but I'm not going to require that because I am --

16 I do think there is something to the argument that based on the

17 Plaintiffs' evaluation on the ground of these custodians and

18 these accounts that it may not make sense to collect them.

19          I think that's all I really need to say about this

20 unless someone has something really compelling to add or

21 anything that really needs to be clarified further.

22          Mr. Przybylko?

23          MR. PRZYBYLKO:  Yeah, the only other clarifying

24 question is, I believe you did say we also get a hit count for

25 those terms as well?

1          THE COURT:  That should certainly be part of the

2   discussion, absolutely.

3          MR. PRZYBYLKO:  Okay, and, well, the only reason I ask

4   is because in the ESI protocol, there's a specific -- you know,

5   we get hits, hits including families and unique hits, and just

6   so there's not fights, I mean, is the idea that we would get

7   that same information or were you just saying a more

8   simplified...

9          THE COURT:  I'm not sure that can be done without

10  collecting the material.

11          MR. McINTURFF:  Correct.

12          THE COURT:  So I think a more simplified version of it

13  should be okay.  Frankly, the more simplified version will

14  probably overstate the volume, if anything, because there won't

15  be de-duplication and there won't be, uh...I don't know if it

16  will incorporate families or not, but I, I'm going to let them

17  go through this exercise in a way that doesn't require them to

18  collect everything, so I don't know that it would really be

19  feasible or realistic to expect them to generate that type of

20  hit report if they haven't really collected everything.

21          Does that make sense?

22          MR. PRZYBYLKO:  Yes.

23          THE COURT:  Okay.  I mean, you may not agree with

24  that, but it makes sense at least.

25          MR. PRZYBYLKO:  Absolutely, your Honor.

1          THE COURT:  Okay.

2          Does that make sense to you, Mr. McInturff?

3          MR. McINTURFF:  Yes, your Honor.

4          THE COURT:  All right.  And, again, you may -- as I've

5    said now, you may choose to just collect them because it may be

6    easier to do it that way, but if not, you know what you need to

7    report back on.

8          How long will it take you to be able to report back on

9    that, Mr. McInturff, in order --

10          MR. McINTURFF:  Well, may I --

11          THE COURT:  -- to run the searches --

12          MR. WITTELS:  May I confer --

13          MR. McINTURFF:  Yeah, may we confer one second?

14          THE COURT:  Let me finish the question, though.

15          In order to run the searches and provide the,

16    the...the hit report in the form that I have, have directed you

17    to provide it here.

18          MR. McINTURFF:  Your Honor, due to my upcoming

19    vacation, which I do not want to disturb if at all possible, we

20    would request thirty days.

21          THE COURT:  Uh...okay.  How long are you taking on

22    vacation?  I, I'm a big supporter of people taking time away

23    from work; let me just be clear on that.  I also thought -- heh,

24    I also thought that Mr. Wittels was, was handling this

25    particular issue.

Disc. Conf.          Cap 111 v. Manhattan Beer                    38

1              MR. WITTELS:  I, I might --

2              MR. McINTURFF:  There's technological...well, things

3  involved.

4              MR. WITTELS:  I'll just say, your Honor --

5              THE COURT:  I was very diplomatic, Mr. McInturff.

6  Thirty days seems like a little longer than --

7              MR. McINTURFF:  Well --

8              THE COURT:  -- it should be for doing this.

9              MR. McINTURFF:  Well, I'm going to be on vacation for

10 two weeks starting --

11             THE COURT:  Okay.

12             MR. McINTURFF:  -- until after Labor Day, and then

13 there's issues with the, with the clients; we haven't consulted

14 with them yet about their schedules, so we're just trying to

15 build in --

16             MR. WITTELS:  Yeah, given, given sort of the end of

17 August --

18             THE COURT:  I understand.  I mean, it is the end of

19 August.  We're not holding up the rest of discovery for this,

20 right?

21             MR. McINTURFF:  No.

22             THE COURT:  Okay.

23             MR. McINTURFF:  No.

24             THE COURT:  Mr. Przybylko, do you have any objection

25 to thirty days?  In light of all of those things?

1          MR. PRZYBYLKO:  I mean, I do think it affects

2   discovery in the sense that this would have been very useful

3   information to have in negotiating the search terms, but I

4   respect the Court's decision, thirty days.

5          THE COURT:  All right, I'm going to give you the

6   thirty days, so that will be -- we'll call that September 15th

7   to report back, but with the understanding that from there, to

8   the extent there are further discussions to be had about these

9   particular custodians, things should move a little bit more

10  expeditiously because I'm going to give you that time on the

11  front end, recognizing the, the...end-of-summer timing of this

12  and keeping in mind my generally stated position, maybe not in

13  this case, but in most cases, that I encourage people to try to

14  have some time away from work whenever possible if schedules and

15  other things allow, so September 15th to report back on those

16  two custodians and we'll see where we are from there.

17         MR. PRZYBYLKO:  Your Honor, on that point, can I just

18  quickly raise an issue that actually Mr. McInturff and I had

19  agreed to raise at the beginning and I think we just forget

20  to...

21         THE COURT:  Okay.

22         MR. PRZYBYLKO:  On the issue of scheduling, the --

23  under the current discovery order that Judge Seibel signed,

24  document production was to be complete by the end of this month,

25  and as you see, we obviously haven't even completed our search

1  terms yet.

2          THE COURT:  Right.

3          MR. PRZYBYLKO:  So we've talked and we've come up with

4  a proposed date to extend it to while we work this all out.  If

5  the Court is amenable, you know, we just wanted to raise that

6  quickly and ask can we submit a proposed modified order or how

7  should we...handle that.

8          THE COURT:  Yes, what -- just so I know, what is the

9  proposed date that you've agreed to?

10          MR. PRZYBYLKO:  I believe we said the end of the year,

11  December 31st?

12          MR. McINTURFF:  Yeah.

13          THE COURT:  Okay.  I mean, that's unfortunate, but

14  understandable given the complexities here, the number of issues

15  that have had to be addressed, the fact that you were waiting

16  for a decision on the motion to dismiss in part, the fact that I

17  have delayed decision on one of my issues until -- one of the

18  issues before me until the resolution of that motion to dismiss,

19  I think that seems reasonable.

20          This is a 2022 case, it's an early 2022 case, and

21  there's a long road ahead still, but in recognition of the fact

22  that the parties have done substantial, substantial work here to

23  try to front as many issues as possible with the hope, and maybe

24  the expectation, that it will minimize disputes in the middle

25  and back end of the discovery process, I will grant that

Case 7:22-cv-01408-CS-AEK  Document 168-1  Filed 05/01/24  Page 42 of 98

Disc. Conf.          Cap 111 v. Manhattan Beer          41

1 application, and so, yes, you should submit a proposed revised

2 case management plan with that date and corresponding

3 adjustments to other dates.

4          I forget how it is set up here because I haven't

5 looked back at the case management plan in a little while, did

6 you have dates there for depositions or was it really only

7 limited to the document -- you were staging it.

8          MR. McINTURFF:  I think that was it.  It was based on

9 Judge Seibel's form and I --

10          THE COURT:  Judge Seibel's form usually does have

11 dates for depositions, though.

12          MR. RIPIN:  Your Honor, that...

13          THE COURT:  This is for the record if this --

14          MR. RIPIN:  Judge Seibel had --

15          THE COURT:  It's Mr. -- hold on.  This is, for the

16 record when it's transcribed, is Mr. Ripin joining us.  For this

17 portion of the...this comment.

18          MR. RIPIN:  I apologize.

19          THE COURT:  That's okay.  I just want to make sure so

20 that the poor court reporter who is going to have to make sense

21 of all of this knows who's speaking.

22          MR. RIPIN:  Judge Seibel had limited discovery, your

23 Honor, to --

24          THE COURT:  Just documents.

25          MR. RIPIN:  Document, documents and interrogatories

1   for the parties.

2              THE COURT:  And was that --

3              MR. RIPIN:  Pending a decision on the motion to

4   dismiss.

5              THE COURT:  Pending a decision, okay, so, in other

6   words, if the case survives beyond the end of this month, then

7   we need to have a, a discovery schedule that encompasses

8   depositions and the like.  If not -- and my understanding was

9   that the reason you were moving forward on the document side was

10  that even if the case were to be dismissed in federal court, the

11  likelihood was that it would be re-filed in some fashion in

12  state court and so you might as well continue the process of, of

13  discovery because it would be transferrable.

14             Is that generally correct?

15             MR. RIPIN:  Yes, your Honor.

16             THE COURT:  Okay.  So we'll -- in other words, we'll

17  know, we should know, by the end of this month whether we need

18  to have a discovery schedule that includes more than just

19  deadlines for the completion of document production?

20             MR. McINTURFF:  That's correct.

21             THE COURT:  Do you agree, Mr. Ripin?

22             MR. RIPIN:  Yes.

23             THE COURT:  Okay, so why don't we do this.  So that

24  you don't do it twice, I will note in the minute entry from

25  today's proceeding that we will extend the deadline for

1 completion of document production until...you said the end of

2 this year; yes?

3          MR. RIPIN:  Yes.

4          THE COURT:  So the end of this year is December 29th.

5 That's a Friday.  Hopefully you won't all be working on December

6 29th.  I will be because I'm on criminal duty that week, but

7 maybe you won't be.  In any event, we'll extend that date till

8 December 29th.  We'll put that in the minute entry so there's no

9 confusion and that has been addressed, but if the case survives

10 beyond the end of August, in light of Judge Seibel's ruling on

11 the motion to dismiss, I will ask you to submit, and we'll put

12 this in the minute entry as well, a proposed revised case

13 management plan that encompasses dates for everything.

14          Judge Seibel's case management plan does not -- all

15 the, all the judges in this building -- myself included, but all

16 the judges in this building have slightly idiosyncratic versions

17 of these case management plans.  Judge Seibel's, for example,

18 doesn't include dates for expert discovery.  It includes a

19 requirement that at the end of fact discovery or some time prior

20 to the end of fact discovery, I think it's thirty days prior,

21 you meet and confer about a schedule for expert discovery and

22 then that gets ordered separately.  I actually think that's a

23 very innovative way of doing it though I haven't borrowed that

24 myself, but it's innovative in that it doesn't require a

25 constant adjustment of the expert discovery et cetera when

1  that's sort of lagging behind the fact discovery schedule

2  anyway.

3          So you should use Judge Seibel's form, this is still

4  Judge Seibel's case so you should use her standard form case

5  management plan, which I can sign because the matter has been

6  referred for general pre-trial supervision, but I always like to

7  use the assigning District Judge's form so that when they look

8  at it, they know what they're looking at and they're familiar

9  with the form and we keep the idiosyncratic portions like the

10 expert discovery deadlines and whatever Judge Seibel says about

11 pre-motion letters and the like that -- for motions that will go

12 to her Honor, so...

13         The end of discovery -- excuse me, the bench ruling

14 that Judge Seibel scheduled on the motion to dismiss is August

15 31st, right?

16         MR. PRZYBYLKO:  Yes.

17         THE COURT:  Okay, so a week after that is September

18 7th, and with the holiday, I'll give you till the Friday,

19 September 8th, to submit, again, if necessary -- and I genuinely

20 don't know whether it will be necessary or not, but if

21 necessary, a proposed revised case management plan as to the

22 remainder of fact discovery using Judge Seibel's form.  That

23 should be submitted by September 8th.

24         Okay, I think that covers the first, first of our

25 issues and issue 1A, which wasn't on the agenda.

1          The next two are closely related to one another and so

2  I think we can take those largely together, although there may

3  be some nuances that you want to point out to me.  These are the

4  letters filed by the Defendants at ECF nos. 123 and 130 and the

5  responses to those letters from the Plaintiffs at ECF nos. 129

6  and 134.

7          In particular, the Defendants are looking for

8  documents and communications from prior to the time when

9  Plaintiffs were customers of Manhattan Beer and specifically as

10  to the knowledge of those Plaintiffs regarding the per-bottle or

11  case deposits required by the Bottle Bill, the New York bottle

12  Bill, and, again, before the time that these Plaintiffs became

13  customers of Manhattan Beer.  There seems to be -- as I

14  understand the letters and the supplemental materials, there

15  seems to be no objection that the Plaintiffs will produce

16  documents on those subjects from the time when they were

17  customers of Manhattan Beer, but the objection is to producing

18  documents that would address the Plaintiffs' knowledge regarding

19  the Bottle Bill and deposit practices from prior to their time

20  as Manhattan Beer customers.

21          I know there's more to it than that, but do I -- am I

22  right on what I've explained so far about the nature of the

23  dispute, Mr. Przybylko, from your perspective?

24          MR. PRZYBYLKO:  Mr. Ripin actually is going to be

25  handling this part of it.

1          THE COURT:  Mr. Ripin?

2          MR. RIPIN:  Yes, your Honor.

3          THE COURT:  Okay, Mr. McInturff?

4          MR. McINTURFF:  Yes, your Honor.

5          THE COURT:  Okay.

6          And I further understand that the Plaintiffs' position

7     is essentially that, sure, the material or the information from

8     the time when we were customers is relevant because it, it will

9     shed light on not only our knowledge from our sources at --

10    during that time period, but also communications with Manhattan

11    Beer about, about the Bottle Bill and deposit practices and

12    we're not going to try to separate out those two things for that

13    relevant time period, what they, Plaintiffs, believe to be the

14    relevant time period, but for the time period preceding the

15    beginning of the customer relationship, the Plaintiffs' position

16    is, no, you're not entitled to that information, it's not

17    relevant, nor is it proportional to the needs of the case even

18    if it were relevant, because ultimately the issue here is that

19    the Defendants, in Plaintiffs' view, concealed the, the nature

20    of this additional charge, and whether or not the Plaintiffs had

21    some prior understanding of the Bottle Bill generally and the

22    fact that the Bottle Bill didn't include as part of the

23    requirements a, a deposit, an additional deposit for cardboard

24    boxes is really not the point.  The point is that the Defendants

25    failed to disclose that they were charging this additional fee

1   that was not part of what was contemplated by the Bottle Bill.

2          That was mostly a statement of the Plaintiffs'

3   position, so, Mr. McInturff, have I understood that correctly so

4   far?

5          MR. McINTURFF:  Yes, your Honor.

6          THE COURT:  Okay.

7          All right, Mr. Ripin, I'll start with you, I mean,

8   again, against that backdrop, so I have read the materials and I

9   do have a, a pretty foundational understanding of the parties'

10  arguments here.

11         MR. RIPIN:  Your Honor, I -- just the -- just what

12  your Honor just said, the common denominator of all of these

13  requests, so we have an initial letter motion and then a

14  subsequent letter motion, and I apologize that it was done

15  piecemeal, but the --

16         THE COURT:  No, no apologies, and I think it was

17  helpful in the sense that you all seem to acknowledge that

18  they're the same issues, but sometimes things come up the way

19  they come up, and you all have been very scrupulous with respect

20  to the timing in my orders about raising disputes and I, I

21  essentially have asked for it in that sense, so I, I do

22  appreciate the careful attention that you're all paying to it.

23         Go ahead.

24         MR. RIPIN:  So the common denominator of all the

25  requests is that Plaintiffs have agreed to produce responsive

1  documents for the period in which the Plaintiffs were Manhattan

2  Beer customers.

3          THE COURT:  Right.

4          MR. RIPIN:  They're not, they're not disputing the

5  relevance of, of each of those requests with respect to that

6  period of time.  Their only objection is, is their contention

7  that the relevant documents were created after Plaintiffs became

8  Manhattan Beer customers, and I would -- I guess just with

9  respect to your Honor's statement, I think you said they had

10 raised proportionality.  They have not raised proportionality

11 with respect to this.  Their, their only objection is a

12 relevance objection, and I'm just quoting, the quote relevant

13 documents were, quote, created after Manhattan Beer became --

14 after the Plaintiffs became Manhattan Beer customers.

15          But this, this position, it's not only inconsistent,

16 your Honor, it's, it's indefensible.  If the documents are

17 relevant for the period in which the Plaintiffs were Manhattan

18 Beer customers, they're equally relevant for the period before

19 they became customers.  The requests go to their, their

20 knowledge, their prior knowledge and experience with bottle

21 deposits, and to, to make the objections that they've made on

22 relevance grounds to, to a prior period when, when they've

23 agreed to produce the documents for this period, it just doesn't

24 make any sense, your Honor.

25          Because they have not objected to the relevancy of

1   these requests during the period of their business relationship,

2   the relevancy arguments are essentially a red herring.  They,

3   they assert that reasonable reliance depends upon actions taken

4   by Defendants, but the cases are clear that reasonable reliance

5   is intensely fact specific, which is why courts typically deny

6   motions to dismiss and summary judgment on this basis.

7          And, by the way, it is not just even -- even if the

8   reliance issue came out differently, which it doesn't, it's not

9   just a question of reliance.  In other words, they have

10  allegations that they were, quote, led to believe that the extra

11  ten-cent charge was part of the State-Mandated deposit.  That's

12  paragraph 3 of their pleading.  The facts were not known or

13  reasonably discoverable by the Plaintiffs in the class; that's

14  paragraphs 192 and 204 of their pleading.  At a minimum, the

15  information would be relevant to, to refute those allegations,

16  that the true facts were not discoverable by Plaintiffs, so even

17  leaving aside the question of, of reliance, this information is

18  clearly relevant just with respect to the -- their own

19  allegations in their complaint.

20         But getting back to their argument on reliance, they

21  -- they're, they're relying on the *Fitzgerald* case in which --

22  which doesn't even address reasonable reliance, it's, it's a

23  case by Judge Seibel so they've, they've highlighted it for

24  that, for that reason, your Honor, but it doesn't even --

25         THE COURT:  As people do.  I read, I read the case.  I

Case 7:22-cv-01408-CS-AEK   Document 168-1   Filed 05/01/24   Page 51 of 98

Disc. Conf.          Cap 111 v. Manhattan Beer                    50

1  mean, it's certainly -- it's about fraudulent inducement, so

2  it's, it's sort of the other side of the coin of reasonable

3  reliance, but okay.

4          MR. RIPIN:  Yeah, and so in that case, the Court

5  denied a motion to dismiss and held that the complaint

6  sufficiently alleged a misrepresentation, and in that holding,

7  the Court cited a Second Circuit case, the *Hyosung* case, in

8  which the Court denied a motion for summary judgment.  In both

9  of those cases, your Honor, the Court denied the dispositive

10 motions and allowed discovery, which is entirely consistent with

11 the rule that the question of reasonable reliance is intensely

12 fact specific.

13         We have -- we cited one case to that, all the cases

14 are collected in, in the -- in a, in the *Doehla* case, which we

15 could also cite your Honor to, but I don't think -- it's, it's

16 not a disputed issue that reliance is intensely fact specific

17 and we look at everything.  It's facts and circumstances.

18         THE COURT:  Okay, let me ask you this, Mr. Ripin.

19         Do I understand correctly that what you're trying to

20 establish -- and I understand it's discovery so...you may not be

21 willing to be as narrow as I'm going to ask you to be in terms

22 of this question, but you're trying to establish that these

23 Plaintiffs had an understanding that there was a Bottle Bill and

24 the Bottle Bill had a five-cent deposit for bottles or a...a

25 multiplier when talking about cases, but that there was no such

1   thing as a deposit for cardboard boxes.

2          Is that essentially what you're trying to establish

3   with this discovery?

4          MR. RIPIN:  I think what we're trying to establish,

5   your Honor, is that Manhattan Beer, what they pointed to in

6   their pleading is that the Manhattan Beer invoices have a $1.30

7   charge and they say that that lumps in the ten-cent charge for

8   cardboard.

9          Well, the five -- the, the New York State-mandated

10  charge is 5 cents.  There are 24 bottles in a case.  Twenty-four

11  times 5 equals $1.20.  If you look at all of their experiences

12  with other distributors, other beverage distributors, and they

13  have many, they will presumably have invoices that say case of

14  beer, $1.20, case of beer, $1.20, $1.20, $1.20.  It's not going

15  to say $1.30.  So that when they get the Manhattan Beer invoices

16  and it says something other than $1.20, it says $1.30, that

17  they're -- that puts, that puts them on notice.  And --

18          THE COURT:  I understand that.  I mean, this is -- I

19  was saying right before we came out here today that, you know,

20  this is constantly a source of, heh, frustration for me when

21  dealing with these kinds of cases, not this particular case, but

22  fraud cases generally.  When I litigated fraud cases,

23  affirmatively, in the U.S. Attorney's Office as a civil

24  litigator, we received this type of objection essentially all

25  the time.  Well, we submitted things to you, the Government, and

1  you should have figured out what they meant, you, you could have

2  asked, you could have rejected the, the...the invoice or

3  whatever it is that, that you, the Government, paid and you had

4  the information in your possession to be able to figure that out

5  and, in fact, you eventually did figure it out and that's why

6  you stopped paying.

7           It...as a plaintiff's-side attorney in those cases, my

8  response was, right, but you should have been clearer about it,

9  and if you had explained exactly what it was that you were

10 charging, we wouldn't have paid, and that was the crux of the

11 dispute, which often was vigorously litigated, as this case is

12 being vigorously litigated, so I understand the point very well

13 that essentially these Plaintiffs should have been on, on notice

14 that a charge for $1.30 was out of the ordinary and not

15 consistent with their prior experience, if, in fact, that's

16 true.

17          It strikes me that a lot of ESI discovery on that

18 point is, heh, I'm not, I'm not sure that that's the best way of

19 getting at that information because I'm not sure that the

20 Plaintiffs even dispute that.

21          Do you?  I mean, do you dispute that your clients

22 here, Mr. McInturff, previously paid invoices for Bottle Bill

23 charges for $1.20 per case?

24          MR. McINTURFF:  No, your Honor.

25          THE COURT:  And that, that probably each and every one

1  of these restaurants had, for some period of time, paid such

2  invoices for $1.20 per case.

3          MR. McINTURFF:  That's correct, your Honor.

4          THE COURT:  Okay.  So...I say this all the time, too,

5  I'm starting to bore myself, but judges love stipulations,

6  litigants don't, and I understand that, I've been on both sides

7  of that now, but couldn't there be some sort of simplifying

8  agreement or if not a stipulation, which I understand comes with

9  a whole host of problems, but a request to admit or something

10 that would just get at this?

11         I mean, Mr. McInturff is at least sitting here today

12 not resisting the point that you're trying to establish, and he,

13 he believes, his clients believe, that they have actionable

14 fraud claims despite that knowledge.  They're not going to

15 contest it.  I mean, they won't contest it in depositions, they

16 won't contest it, I would think, in motion practice, which makes

17 sense.  Now, you may think that that's a big feather in your cap

18 on the defense side, and it may be.  Right?

19         I mean, there's -- I went and looked at that *Hyosung*,

20 H-Y-O-S-U-N-G -- I'm not a hundred percent sure how to pronounce

21 that one either, but *Hyosung* case, 137 F.3d 75.  It does say,

22 amazingly enough, sub-quoting a New York Court of Appeals case

23 from 1892, it's always, always nice to see 19th century law to

24 know that we're dealing with things that are well established,

25 is that it has been held -- I'm going to clean up the

Case 7:22-cv-01408-CS-AEK   Document 168-1   Filed 05/01/24   Page 55 of 98

Disc. Conf.          Cap 111 v. Manhattan Beer          54

1   quotations, but it just says, "it has been held that where a

2   plaintiff has the means of knowing by the means of ordinary

3   intelligence, the truth, or the real quality of the subject of

4   the representation, he must make use of those means or he will

5   not be heard to complain that he was induced to enter into the

6   transaction by misrepresentations."  From there, it goes on to

7   include the language that Mr. McInturff relied on and that Judge

8   Seibel relied on in the Truth In Lending Act case that was cited

9   in the letters where justifiable reliance will not be found in

10  cases in which plaintiff was placed on guard or practically

11  faced with the facts.

12          Here, the Plaintiffs' argument is they were not placed

13  on guard or practically faced with the facts.  It seems to me

14  that the response from the Defendants is this is something that

15  these business owners knew by means of ordinary intelligence or

16  the truth, because, I mean, most people who have purchased a

17  bottle of any sort in New York know that there's a five-cent

18  deposit.

19          Now, whether they would know that there's a -- there

20  is or isn't a cardboard case deposit, that's a separate question

21  and that's the question in this case, but as a legal matter,

22  whether that knowledge of the five-cent deposit, the $1.20

23  charge per case, pursuant to the Bottle Bill is a matter of

24  ordinary intelligence or the truth or somehow implicates the

25  quality of the representation by the, by the Defendants here is

Disc. Conf.          Cap 111 v. Manhattan Beer

1  a question for the Court ultimately at some stage in this case,

2  but it seems, perhaps, unnecessary -- and I understand there's a

3  relevance argument, but it seems to me there's also a legitimate

4  proportionality issue here when I don't really even think this

5  point is in dispute.

6          Do you think that there's a path forward here, Mr. --

7  I guess, Mr. Ripin, I'll ask -- I'll continue with you before I

8  turn to Mr. McInturff, but a path forward here to address this

9  issue without having to get all of this discovery?  It just

10  seems really, really unnecessary to me.

11         MR. RIPIN:  Well, I would just, again, reiterate, your

12  Honor, that they have agreed to provide this discovery during,

13  during the business relationship.

14         THE COURT:  Well, and -- but that makes sense for a

15  different reason, because that is going to go to the heart of

16  what communications may have taken place, at least with respect

17  to Manhattan Beer, during that period of time and that seems

18  highly relevant if --

19         MR. RIPIN:  But it -- but, your Honor --

20         THE COURT:  But they didn't limit it to Manhattan Beer

21  is your point.

22         MR. RIPIN:  It's not limited to Manhattan Beer, your

23  Honor, yes.

24         THE COURT:  I understand.  I understand.  And that --

25  there is a little bit of an incongruity there; I agree.

1          MR. RIPIN:  The large crux of those requests, if not

2     all of them, other than the first two on 24 and 25 in the Bottle

3     Bill, has to do with other distributors.

4          THE COURT:  Okay.

5          MR. RIPIN:  Other distributors, your Honor, and just

6     to address your Honor's point, which is that...you know, what --

7     some of the requests go to their knowledge of the Bottle Bill,

8     so we'd like to see, you know, if there's correspondence with

9     respect to that, but to answer your Honor's question, we need

10    the documents.  When we're in front of a jury on this case, it's

11    going to be very compelling for them to see the invoices from

12    the other distributors which has $1.20, $1.20, $1.20, and to

13    talk about what they knew and when they knew it, so I think

14    it's, it's critical that we get the, the documents.

15          The other case that they cited which they relied on,

16    the *Greenway* case against Wildenstein, it's another

17    motion-to-dismiss case.  Again, the Court denies the motion and

18    allows discovery to proceed and the Court --

19          THE COURT:  Right, but we don't know what that -- I

20    mean, those, those are all of limited utility because we don't

21    know what the scope of the discovery was.  I mean, discovery is

22    proceeding here; we just don't know what the scope is.  But I

23    take the point, that discovery was necessary to get to the

24    fact-specific issues on the --

25          MR. RIPIN:  In the, in the vast bulk of cases, the

1  rule is a dispositive motion is going to be denied and discovery

2  is going to be permitted on the issue of reasonable reliance.

3  We didn't make that argument in our motion to dismiss,

4  recognizing that these were factual issues that are going to

5  require discovery and warrant discovery.

6          And, again, they're not raising a proportionality

7  argument, your Honor.  You can look high and wide, the only

8  argument they're raising is relevance, which doesn't make sense

9  because they've effectively conceded relevance by agreeing to

10 produce the same exact request during the customer relationship

11 period with Manhattan Beer.

12         THE COURT:  All right, thank you, Mr. Ripin.

13         Mr. McInturff, I mean, you've heard some of my initial

14 responses and reactions to the arguments, but why don't you try

15 to specifically address Mr. Ripin's point about relevance.  Why

16 in your view is it relevant for the Plaintiffs to produce

17 information about communications with other distributors other

18 than Manhattan Beer during the relevant time period, during the

19 class, the class period, if you will, but not from the time

20 before then to establish the Plaintiffs' knowledge and

21 understanding of what the Bottle Bill required and what their

22 prior interactions were with other distributors prior to

23 beginning their customer relationship with Manhattan Beer.

24         MR. McINTURFF:  Sure, your Honor.

25         You know, going back to the no good deed goes

1   unpunished, we don't concede that, that what other beer

2   distributors did was relevant, but we wanted to minimize

3   disputes.  We told the Defendant that we would agree to search

4   for these documents.

5           I will note that Counsel represented that he thought

6   it would be a good demonstrative that -- to have the invoices of

7   other beer distributors showing $1.20 charges.  They produced

8   the data recently...

9           THE COURT:  Yeah.

10          MR. McINTURFF:  For the proposed class.  They can use

11  the data that shows that the Plaintiffs paid $1.20 to them, so,

12  again, this is not -- I'm not trying to make defense counsel's

13  case, but it is a proportionality argument where --

14          THE COURT:  I'm sorry, I don't understand that point,

15  that Plaintiffs paid $1.20 to Manhattan Beer?

16          MR. McINTURFF:  To Manhattan Beer.

17          THE COURT:  On other invoices --

18          MR. McINTURFF:  On --

19          THE COURT:  -- where the $1.30 wasn't being charged?

20          MR. McINTURFF:  And, and -- both.  And on the same

21  invoice.

22          THE COURT:  Okay.

23          MR. McINTURFF:  So it -- this is -- in our view, it's

24  overkill, this is -- it, it's too much, for a point that is not

25  really contested, that can be established through a deposition,

1  through their own data, through, through the data that we're

2  agreeing to produce during the period in which the Plaintiffs

3  were customers.  It's just -- they -- and the context here is we

4  removed the date limitation on our discovery as a result of the

5  first conference in this case so the Defendant has removed their

6  date limitations, and so now we're having a fight about the date

7  limitations as a result of that and it's just -- it's simply

8  overkill, it's, it's --

9       THE COURT:  Okay.  I mean, to be fair, that's not a

10  relevance argument; that's a proportionality agreement.

11      MR. McINTURFF:  I'm making both.  But in terms of

12  relevance, one, it's -- the central focus here is what the

13  Defendant did to put Plaintiffs on notice that they, in our

14  view, could not trust the deposit line item on the invoices.

15  They had to -- and Judge Seibel made it clear at the first

16  conference that this case is going to be about what Defendants

17  told the Plaintiffs about this supposed cardboard charge.

18      Again, we're calling it a cardboard charge out of

19  convenience.  There's nothing that the Defendants gave the

20  Plaintiffs that explains any aspect of this charge.  Defense

21  counsel's having to, having to rely on math to make the claim

22  that the Plaintiffs were not reasonable in receiving a receipt

23  from a beer distributor that was collecting a State-Mandated

24  charge and relying that that charge was just going to include

25  what the State required, so it's, it's not relevant what some

Case 7:22-cv-01408-CS-AEK   Document 168-1   Filed 05/01/24   Page 61 of 98

Disc. Conf.          Cap 111 v. Manhattan Beer          60

1  other distributor did or didn't do.  It's not relevant that the

2  Plaintiffs knew that a, a bottle carried a five-cent charge.

3          We brought, we brought a demonstrative here.  This is,

4  this is a bottle.  They all say there's a five-cent charge.

5  It's written on the bottle.

6          THE COURT:  Okay.  I mean, I understand the point.

7  You -- this case is rich with demonstratives, from day one, but

8  it, it...okay, continue, Mr. McInturff.

9          MR. McINTURFF:  No, I mean, I think, I think the

10  issue's been, been well...flogged.

11          THE COURT:  Okay.

12          I mean, Mr. Ripin, let me come back to you.  You know,

13  I understand you relied, no pun intended, on the idea here that

14  this was mostly focused on a relevance argument, but Mr.

15  McInturff has articulated, at least sort of in a cursory manner,

16  the proportionality argument as well, and that argument does

17  seem to be somewhat useful here.

18          Again, you -- heh, I don't -- it doesn't sound like

19  there's going to be any dispute that these Plaintiffs...they'll

20  concede that they knew that there was a five-cent deposit on

21  bottles and $1.20 deposit based on the math on a case pursuant

22  to the New York Bottle Bill, so why is it necessary to go and

23  conduct a whole bunch of electronic discovery on that when it

24  seems as though this could be the subject of a request to admit

25  and certainly could be the subject of deposition testimony.

Case 7:22-cv-01408-CS-AEK   Document 168-1   Filed 05/01/24   Page 62 of 98

Disc. Conf.          Cap 111 v. Manhattan Beer                    61

1          MR. RIPIN:  I mean, I'd like to at least address that

2     proportionality point, even though, again, it's not raised in

3     the letters.  We're hearing it literally for the first time

4     here.  I mean, we could certainly argue that they've waived that

5     argument, your Honor, because it's, it's nowhere in the letters.

6     Having said that, I would just say that the requests that are at

7     issue here are not burdensome requests, which is likely why they

8     haven't raised proportionality.

9          Request no. 3 is documents summarizing the amount of

10    deposits paid by Plaintiffs to other distributors for cardboard

11    boxes and 4 is refunded for cardboard boxes.  They've sort of

12    told us informally there aren't any, so that's zero.  Five and 6

13    were asking for exemplars, exemplars of invoices, received by

14    Plaintiffs from other distributors.  We're not asking for all

15    invoices; it's literally exemplars.  No. 5 is documents

16    sufficient.  Again, we're not asking for all documents, it's

17    documents sufficient.  So these are not, these are not

18    burdensome requests.  They're not going to have an issue with

19    cost and expense.

20          Believe me, your Honor, they would have raised that

21    objection.  They're not shy.  They, they've raised it plenty of

22    times in the past.  There's a reason why they agreed to produce

23    it during the business relationship and there's a reason why

24    they did not assert proportionality as a reason for objecting

25    prior to the relationship, but very, frankly, the argument that

1   counsel makes that they haven't conceded relevance during the

2   relationship, that they only did this to, to minimize disputes

3   and, and move the case along, it's simply not credible, your

4   Honor.  You know, they could have minimized the disputes by

5   agreeing to do this also, which is concededly not a burdensome

6   exercise.

7           You know, they keep citing -- they cite, cite to Judge

8   Seibel's remarks.  Well, her remarks did not address the scope

9   of discovery, they were not intended to address the scope of

10  discovery, they were certainly not intended to limit the scope

11  of discovery.  We're entitled to pursue this relevant discovery

12  which they've conceded is relevant and they haven't asserted

13  proportionality objections to as well.

14          THE COURT:  Mr. McInturff?  I mean, I, I am

15  sympathetic to the Plaintiffs' position here in certain respects

16  and Mr. Ripin, though, has appropriately focused on some of

17  these requests that call for exemplars and documents sufficient

18  to show.  That doesn't seem burdensome.

19          MR. McINTURFF:  Well, it is quite burdensome, your

20  Honor, because it's before the relationship with Manhattan Beer.

21  We're talking, we're talking potentially going back many, many

22  years.

23          THE COURT:  Well, but, again, that's just a question

24  about scope that can be negotiated.  I mean, I'm not sure if

25  they're really talking about going back to the beginning of

1  time.

2          When did the Bottle Bill get passed?  In the eighties?

3  Do we need to have documents going back to the eighties?  I

4  don't think so, right?

5          MR. RIPIN:  No.

6          THE COURT:  No.  So, again, I think some, some set of

7  documents could be produced probably without all that much

8  difficulty that establish that prior to a relationship with

9  Manhattan Beer that the Plaintiffs were aware that there was a

10 bottle-deposit requirement and that they routinely paid it in

11 the amount of $1.20 per case, but...what.

12         MR. McINTURFF:  I mean, it's just -- it really is just

13 an exercise in overkill.  I mean, there's many other discovery

14 devices where the Defendants can make their point.

15         THE COURT:  But I --

16         MR. McINTURFF:  They don't --

17         THE COURT:  -- agree that an exercise in overkill is a

18 reasonably good argument, one which you didn't make until today,

19 but it's not as great an argument when you're talking about

20 documents sufficient to show and exemplars, right?  At least for

21 those two.  Requests.

22         MR. McINTURFF:  It was -- the -- it's the burdensome

23 of the nature of the search, having to go back and, and locate

24 it during, you know, the, the previous periods.  It is

25 burdensome, and it, it requires us to spend a significant amount

1  of time back with the client.  Not all of these documents are in

2  electronic format.  It's, it's disruptive and, again, the, the

3  benefit is clearly outweighed by the cost.  We're not --

4          THE COURT:  But that's a hard argument for me to

5  grapple with without having any idea what the cost is,

6  especially when I don't have any idea what the parties could do

7  to narrow the scope further, right?

8          Again, it's easy to, to magnify the potential cost and

9  burden by saying, well, they're looking for documents dating

10 back to 1987 and they need it for every single restaurant and

11 they need every month's invoice, but I don't actually think that

12 would be reasonable at all, and I don't actually think that

13 that's what the Defendants are looking for.

14         I'm not sure I agree with Defendants that they need

15 this in order to be able to make some sort of demonstrative

16 showing at trial, especially if they have testimony or

17 admissions from the Plaintiffs about the relevant information,

18 but that -- it's not up to me to decide what someone's trial

19 strategy should be.

20         MR. McINTURFF:  Could, could I make an additional

21 point?

22         The other thing we could do with this dispute is it

23 could be deferred until we have production and depositions, and

24 if the Defendant feels at that point that this discovery is

25 necessary, we can renew it at the time.  This is, this is, at

1  best, a collateral issue.  We're talking about going back in

2  time from before the time that Plaintiffs had a relationship

3  with the Defendant, the, the issue of this case is, is the

4  Defendants' invoicing practices --

5          THE COURT:  All right, and you keep saying that and I

6  understand that, but even the case you cite to try to drive home

7  that point, Mr. McInturff, cites, in turn, to a case that says

8  it is important to understand that where a plaintiff has the

9  means of knowing by means of ordinary intelligence, the truth,

10  or the real quality of the subject of the representation, he

11  must make use of those means.  In other words, what the

12  Plaintiff knows is relevant.

13          MR. McINTURFF:  Well, so -- then that goes to the

14  issue of the standard.  It's an objective standard.  The

15  question of whether or not the Plaintiffs acted reasonably in

16  this circumstance is, is objective, it doesn't depend on their

17  subjective conduct.  It depends on -- there's likely going to be

18  expert testimony, there will be -- we're going to talk about

19  data, we'll talk about what, what people do en masse --

20          THE COURT:  But you don't, you don't think that it's

21  relevant to the objective analysis to, to consider that the

22  Plaintiff, if this is true, routinely paid a certain amount for

23  these types of charges for...years?

24          MR. McINTURFF:  If, if I'm defense counsel, I wouldn't

25  make that argument, but they're welcome to make the argument.

1          THE COURT:  I'm not sure I would make that argument

2    either, but I -- that wasn't my question.

3          MR. McINTURFF:  This is my point, is, is there are

4    other discovery devices here.  We're, we're operating in a

5    regime where Judge Seibel made a decision about what was going

6    to go forward pending the ruling on the motion to dismiss.  That

7    does not mean that we use the only discovery device we have now

8    to build our case.

9          THE COURT:  Okay.

10          Mr. Ripin, do you have any thoughts on that particular

11    point?

12          MR. RIPIN:  Well, relevance -- just a couple, and

13    relevance for purposes of discovery is -- obviously it's broader

14    than in scope than relevance for --

15          THE COURT:  I obviously know that, yes.

16          MR. RIPIN:  -- trial, and there's no reason why we

17    should be foregoing relevant discovery pending the production of

18    other relevant discovery in response to other requests.  They're

19    limiting their initial collection based upon their, their

20    objections, which is not appropriate.

21          Did you want to address the other...

22          MR. PRZYBYLKO:  Oh, yeah, I just wanted to say

23    briefly, your Honor --

24          THE COURT:  This is Przybylko for the record.

25          MR. PRZYBYLKO:  Yeah, to talk about proportionality,

1  we've already proposed some search terms that would get at some

2  of these issues and going to Mr. Ripin's point that we're not

3  talking about, like, swamping them.  'Bottle billed,' do you

4  know how many terms that hit in their current correction?

5  Thirteen documents, your Honor.  We're not talking about crazy,

6  broad, you know, additional collection or production

7  obligations.

8          MR. McINTURFF:  Can I confer?  For one second here?

9          THE COURT:  Yes.

10          (Discussion off the record)

11          MR. McINTURFF:  I think that --

12          MR. WITTELS:  Your Honor, I would -- if I may --

13          THE COURT:  Just --

14          MR. WITTELS:  -- address --

15          THE COURT:  Just for the record, this is Mr. Wittels.

16          MR. WITTELS:  Thank you.

17          To address the proportionality argument, there is a

18  difference, because I was involved in going to the restaurants

19  and, and asking them where certain things are located.  They

20  don't have -- I mean, to go back and find invoices and things

21  from before, and we're talking about restaurants that some of

22  them are going back to 2016, they have this stuff in boxes in,

23  like, a dusty...part of the restaurant where they don't even

24  know where these invoices are, so you're not talking about ESI

25  type of documents.

1          THE COURT:  Okay, but, again, that, actually, is a

2   valid argument which you didn't make coming into today because I

3   don't think you've actually asked the question specifically.

4   There may be boxes and they may be dusty and they may be

5   inaccessible, but maybe the invoices are in a file cabinet under

6   the manager's desk.  I mean...do you know that --

7          MR. WITTELS:  I, I --

8          THE COURT:  -- with certainty?

9          MR. WITTELS:  I...I've asked them, because they have

10  different restaurants, I saw them, they're piled-up boxes from

11  -- they don't even know.  They shove them into a back.  And

12  they're not, they're not just invoices from -- I mean, it's just

13  not buying beverages, they're restaurants.

14         THE COURT:  I --

15         MR. WITTELS:  Food, everything's in there and you have

16  to look in individual folders to find particular invoices.  It's

17  a very burdensome task, so I would ask that your Honor accept at

18  least that in response to why this is burdensome now.

19         And to reiterate what Mr. McInturff said, we haven't

20  seen -- you know, other than the data we just got, we don't have

21  any documents about what went on in terms of Defendants'

22  knowledge and with respect to the bill -- you know, the bottles

23  and --

24         THE COURT:  Right, but what does that have to do

25  with --

1          MR. WITTELS:  Well, what I'm --

2          THE COURT:  -- this particular set of requests?

3          MR. WITTELS:  -- what I'm saying is we're in the

4    earliest stages of the case and there is a reason to perhaps

5    defer this question about a prior period that involves us having

6    to go back to the client and say you gotta start going through

7    dusty boxes to find things that, A, I don't think are relevant

8    and, B, it's very difficult to find, and so I would ask that you

9    defer, certainly, a ruling on this until we have further

10   discovery.

11         MR. PRZYBYLKO:  I'm sorry, can I just respond to one

12   point about the ESI of it all?

13         THE COURT:  Yes.

14         MR. PRZYBYLKO:  Whether there are dusty boxes or not,

15   they're still relevant ESI that Plaintiffs have refused to

16   collect and search, so regardless of their position on the dusty

17   boxes, they can certainly collect E -- additional ESI and apply

18   search terms that their current hit reports are showing are not

19   going to result in a huge burden, so I don't, I don't think what

20   we ultimately produce has any bearing on their current discovery

21   obligations.

22         MR. McINTURFF:  Again, your Honor, the additional cost

23   of making a collection does not -- it clearly outweighs the

24   benefit of the point the Defendants are trying to make.  Your

25   Honor opened with "can't you stipulate."  I gave them five other

1  examples of proof in their own documents that they can use.

2  This is clearly an effort to impose costs on us just to prolong

3  the case when we could be focusing instead on producing

4  documents, which we can't do now, we have to now -- it has to go

5  until December, and this is just -- it's just make work on our

6  side, it's not going to be something critical to the case, and

7  to the extent the Defendants have a particularized need, after

8  we've gone through the ordinary course of discovery, they can

9  come back and we can deal with the issue at that time, but it

10 doesn't make sense to impose the costs on us for, for this

11 satellite issue.

12          MR. RIPIN:  Your Honor, this is a disingenuous

13 argument.  I -- having --

14          THE COURT:  Okay.  I got it.  Here's the thing.

15          With respect to combing through paper files that are

16 not maintained in an easily accessible format for documents that

17 date back many, many years, I do have some concern that that is

18 an unnecessary exercise and expenditure of resources that would

19 be required for this particular set of requests, which really is

20 getting at a set of issues that I think is barely in dispute, if

21 at all in dispute.

22          So, look, there may need to be further inquiry about

23 this at depositions some day about whether these files, the

24 paper versions of these files, are really as difficult to access

25 as Mr. Wittels has just referenced, but I will accept the

1  representation from Mr. Wittels as an officer of the court, but

2  it better be right.  If they come back and say that there's

3  deposition testimony, if we ever get to that point in this case,

4  and your clients say, "oh, the invoices for beverages, yeah,

5  that's just right here in my file cabinet," I'm going to be very

6  annoyed, so if you need to double-check about that, Mr. Wittels,

7  please do.  If you're a hundred percent confident in your

8  representation, then you don't need to double-check, but if

9  you're anything less than a hundred percent confident, make sure

10 you double-check, because that representation is persuasive to

11 me in light of what we are talking about here and the, the need

12 for this material, heh, given what Mr. McInturff has already

13 stated on the record here.

14         Now, you can't use that in court, but there are ways

15 of getting information that you can use in court at trial

16 without having to go through a laborious search through the

17 dusty boxes.  The colorful metaphors of the dusty boxes pop up

18 in a lot of cases and I, I...I won't bore you with the details

19 of some of my favorite references, but there are many and this

20 will now go on to the list, but with respect to the ESI and the

21 possibility of gathering some of these exemplar documents

22 through ESI, again, we've been talking about this for a long

23 time now, I, I can't accept the representation that collecting

24 an additional period of time from the Plaintiffs' electronic

25 files and running additional -- or running the same search terms

1  that they've been running would be unduly burdensome or

2  disproportional to the needs of the case.

3          There isn't really an argument here that it -- that

4  the discovery that's being sought by the Defendants is not

5  relevant.  There is an argument, but I don't find that argument

6  to be particularly compelling.  Whether that's a good argument,

7  whether that's a winning argument for the Defendants at trial,

8  I'm certainly not convinced of that, but, but whether it's an

9  appropriate subject for some discovery as to understand the

10  scope of the Plaintiffs' knowledge regarding Bottle Bill

11  practices, ordinary intelligence, the truth, what the Plaintiff

12  had means of knowing by those two elements, showing the bottle,

13  in some ways, Mr. McInturff, reinforces the idea that the

14  Plaintiffs could have had this knowledge about the scope of the

15  Bottle Bill by their ordinary intelligence and it's a matter

16  that we all have some understanding of.

17          What I find persuasive from the Defendants' point of

18  view here is -- at least the request that Mr. Ripin

19  strategically pointed me to, are the ones that call for

20  exemplars and call for documents sufficient to show.  I haven't

21  gone back now -- and there are so many different issues here

22  that I haven't committed them all to memory, I haven't gone back

23  to look to see if all of the requests at issue here, which is at

24  least one, two, three, four, five, six, seven, eight, nine

25  different requests from different RFPs, requests for production,

1  if they're all similarly limited or whether Mr. Ripin has made

2  good use of the examples that he provided.  Those examples,

3  again, are, are quintessential examples where proportionality is

4  not a particularly great objection because of the limited

5  nature, and the Defendants have already represented here in

6  response to my question that they don't intend to seek documents

7  for the entirety of recorded history with respect to the Bottle

8  Bill, so we don't need documents going back to 1987 or whatever

9  it was in order to make the point that they are trying to make

10 with those documents.

11         So with that said, making modifications to the ESI

12 searches and time periods in order to account for responses to

13 these requests from a time period prior to when the Plaintiffs

14 became customers of Manhattan Beer seems not only relevant, but

15 proportional to the needs of the case absent any further

16 specific showing as to proportionality from the Plaintiffs'

17 side, and my hope and expectation, in light of all of this

18 commentary today, is if the Plaintiffs come back and say, look,

19 this is the expense to go back twenty years, this is the expense

20 to go back fifteen years, this is the expense to go back ten

21 years, or somehow they can slice it in that way, that there will

22 be a reasonable negotiation and agreement that in order to

23 establish that which the Defendants are trying to establish,

24 it's not necessary to go to such extraordinary lengths, because

25 we all know that even the collection of that data has an

1  expense, even if ultimately not too many documents hit on it, so

2  the review portion of it wouldn't be necessarily burdensome.

3          So at bottom, I'm not going to require the Plaintiffs

4  to go back and search through paper files for these materials

5  now, given, given all the things that we've discussed.  I think

6  it is appropriate in light of the extension and in light of the

7  ongoing negotiations regarding ESI to have the Plaintiff collect

8  the additional information, the additional time periods, that

9  would allow them to run appropriate searches and evaluate the,

10  the scope of potentially responsive material for these requests

11  for some period of time prior to the time that they became

12  customers of Manhattan Beer, but, again, there should be

13  good-faith discussions about how that can be done in a way that

14  allows the Defendants to receive what they feel they need to

15  receive, but without belaboring the point, because, again, I do

16  agree, to some extent, with the Plaintiffs' position that there

17  are other ways of getting at this information, including some of

18  the ways that I have suggested.

19          So, again, it's a sort of middle-of-the-road solution

20  here for you, which I probably have managed to frustrate both

21  sides equally, maybe not equally, I don't know, but I think

22  there is a middle-of-the-road position here that is,

23  uh...sufficient to address the, the legitimate requests that the

24  Defendants have made, but also the concerns that the Plaintiffs

25  have articulated.

1            Does that require any further clarification, Mr.

2  McInturff?

3            MR. McINTURFF:  No, your Honor.

4            THE COURT:  Mr. Ripin?

5            MR. RIPIN:  No, your Honor.

6            THE COURT:  Okay.

7            Listen, I know we've been here for a while.  I happen

8  to say -- I happen to think that the arguments on these points

9  are very, very helpful for me.  I will say that my final views

10 and, and orders on these are not entirely what I thought they

11 would be when I came out here, so I, I appreciate that you're

12 being patient with me and helping me work through the issues

13 because, again, your letters were well presented on both sides,

14 but the arguments here have been helpful and supplemental, which

15 is why I do it this way, and so I do appreciate that.

16            The last issue is with respect to the data requests

17 from Plaintiff.  This is ECF no. 135 and Defendants' response at

18 138.  This is an issue that we talked about back in April, I

19 believe.  At least that was what was pointed out in the

20 Defendants' response, and I went back and looked at that portion

21 of the transcript.  At that time, I did require you to go back

22 and meet and confer and discuss further.

23            I -- my -- I'll give you, as I have so far today, my

24 initial reaction, which is to say I don't understand the

25 relevance, Mr. McInturff, of what you're asking for.  I

1  understand what you've written, the four categories or the four

2  reasons why you think you need the data for invoices that are

3  beyond the, the -- what we have been referring to as the

4  ten-cent deposit fees for cardboard as oppose -- you say you

5  need to know, the Plaintiffs need to know, the percentage of

6  class member deposit charges that involve the disputed fee, the

7  amount of the disputed fee relative to the total amount of

8  State-Mandated deposit fees, the number of class member

9  transactions relative to the number of transactions involving

10 the disputed fee, and the Defendants' frequency of invoicing

11 class members.  I really am not sure why you need any of that

12 information, why any of that is relevant.

13         Again, it -- to me, it comes across as you're looking

14 to understand what I refer to as the denominator.  Someone made

15 a denominator reference earlier, but that's how I'm thinking of

16 it here.  The percentage of the class member deposit charges

17 that involve the disputed fee, well, the data you'll have will

18 give you the number of charges that involve the disputed fee,

19 just not the percentage.  I, I'm quite sure that whatever the

20 percentage is, you'd argue it either way.  I mean, if it's a

21 small percentage of charges that involve the disputed fee,

22 you'll use that to argue that it's that much more obscured.  If

23 it's a large percentage, you'll argue that it's, it's, it's

24 repetitive and endemic and that much more of a problem.  You

25 know, some of those arguments may be stronger than others, but,

1  in any case, the amount of the fee relative to the total amount

2  of State-mandated deposit fees, again, that's a denominator

3  question, right?  You'll know the amount of the fee.  And the

4  number of class member transactions relative to the number of

5  transactions involving the disputed fee, again, I mean, you'll

6  know what the number of transactions is and you'll know the

7  frequency of invoicing at least as to the disputed fee.

8          So I, I'm having a hard time understanding why you

9  need the full data set that you've described here, why that's

10 relevant.

11         MR. McINTURFF:  Sure, your Honor.

12         If I could give an example from other consumer fraud

13 cases we've done...

14         THE COURT:  Okay.

15         MR. McINTURFF:  The overall data has proven critical

16 in deposition discovery, putting in light -- shedding important

17 context on document discovery and, and very important for expert

18 discovery in terms of answering questions like 'so the

19 Defendants' main defense here is, hey, you should have looked at

20 the receipt and realized what's going on.'

21         We, we haven't decided on an expert yet, but I can

22 tell you in a past case, we used this exact data for the basis

23 for the expert to say, no, no one in their right mind is going

24 to look at this and my opinion is admissible, in part, because

25 of this extensive data that is available that I have looked at

1  and analyzed and I am able to make that conclusion based on this

2  data.

3         We have, we have had depositions where there have been

4  internal analyses of the underlying data, but the analyses were

5  very favorably skewed to the position of the, of the internal

6  officers.  We show the deponents the actual data and ask them if

7  their opinion change -- changes or if their conduct would have

8  been different based on what the data actually shows.  We've

9  had, we've had, we've had -- we had a case where there was an

10 internal analysis of underlying data.  We took the same data,

11 did the same analysis, and showed that, in fact, this, this

12 internal analysis that was setting off alarm bells at the

13 company was -- I think it was off by, you know, a factor of ten

14 in terms of how big of a deal that the data showed, so the, the

15 total data, knowing the denominator, allows us to make

16 statements about the actual scope of the challenged conduct.

17        Like, we, we -- we're getting -- so -- well, I should

18 say, there's a point I'd like to make about the size of the

19 class and the number of transactions at issue and the, the

20 amounts that have been, that have been recovered, and I don't

21 understand why, but the Defendants marked all of that

22 confidential, so I wanted to raise with your Honor, it's, it's

23 been our experience that in open court, data like that can be

24 shared, but I don't want to, I don't want to raise an issue

25 without first addressing your Honor about it, so...

Disc. Conf.          Cap 111 v. Manhattan Beer

 1              THE COURT:  Okay.

 2              I mean, is there any concern about that, Mr. Ripin?

 3  Mr. Przybylko?

 4              MR. PRZYBYLKO:  Yes, this data -- I mean, I don't know

 5  what they intend to disclose, but this data has product codes

 6  and --

 7              MR. McINTURFF:  No, no, no, no.  Size of the class...

 8              MR. PRZYBYLKO:  Oh.

 9              MR. McINTURFF:  Amounts collected, number of

10  transactions.

11              MR. PRZYBYLKO:  Yeah, no, I have no objection to that

12  specifically.

13              THE COURT:  Okay.

14              MR. McINTURFF:  So --

15              THE COURT:  Thank you for handling it that way,

16  though, Mr. McInturff.

17              MR. McINTURFF:  Thank you.

18              So we're talking about a hundred million plus

19  transactions that have this disputed ten-cent charge.  We're

20  talking about --

21              THE COURT:  Did you say a hundred million?

22              MR. McINTURFF:  A hundred million.

23              THE COURT:  Wow.

24              MR. McINTURFF:  Yeah.  It's a lot.

25              We're talking about the disputed charge itself from

1  the -- remember, we have a dispute about the scope of the class

2  data to be produced.  The undisputed data that has been

3  produced, we're talking plus $10 million in ten-cent fees, and,

4  again, we're asking for data going back in time which will

5  likely increase that, we're talking about more than 30,000

6  different entities that, that we have data on.

7              Now, again, because the --

8              THE COURT:  Does that mean -- when you say 30,000

9  different entities, do you mean different customers?

10             MR. McINTURFF:  Potential class members.

11             THE COURT:  All right.

12             MR. McINTURFF:  It's not -- you know, 'customer' is

13 not as precise a term as 'different entities.'  As you can see,

14 like, in our case, we have --

15             THE COURT:  Different entities is the more precise

16 term?

17             MR. McINTURFF:  Uh, yeah, it is.

18             THE COURT:  Okay.

19             MR. McINTURFF:  'Cause, you know, customer is more

20 colloquial.  You know, you can, you can buy on behalf of several

21 entities as a customer, but -- and the accounts are different.

22 That's -- we would -- in a case like this, your class would be

23 based on account number.

24             THE COURT:  I understand.

25             MR. McINTURFF:  So you might have multiple accounts

Disc. Conf.          Cap 111 v. Manhattan Beer

1  for the same restaurant, but...

2          THE COURT:  Okay.

3          MR. McINTURFF:  Fair point.

4          THE COURT:  I understand what you're saying.

5          MR. McINTURFF:  Yeah.

6          So, so, again, with these, you know, hundred dollars

7  of millions of data points, we've -- what we've got in the data

8  right now, we have information, for example, about the number of

9  $1.20 deposits on cans, we have information about how -- we

10 think we have information about how often a class member

11 actually returned the cardboard box and that it wasn't in

12 connection with just a return of the entire case of beer, you

13 know, the, like, I-didn't-order-this scenario, but actually when

14 somebody actually picked up the box and gave it back to the

15 Defendant.

16         We want to, we want to put that conduct -- because,

17 again, the Defendant's saying you knew, you should have known.

18 We want to put that conduct in its actual context in which it

19 exists in the real world, and, and we've gotten a portion of

20 that because the Defendants when -- you know, they're giving us

21 receipt data, so if you buy a case of bottles and it carries a

22 dollar thirty charge and you buy ten cases of cans and it

23 carries $1.20 charge, we get the can data, but if you just turn

24 around the next day and you make a -- just a can purchase,

25 they're withholding that data, so that means it -- it's going to

1  greatly complicate our analysis of the big picture of what's

2  going on.

3          Also, there could be -- I should also say we've now

4  learned that in addition to the cases, the 24 cases, they're

5  charging a fee on, on wine, they're charging a fee on cases that

6  are less than 24, so there's a ten-cent fee on an 18-case --

7  18-bottle case we've seen where, I mean, we got the data very

8  recently so we're, we're still sort of understanding it, but

9  it's not inconceivable that somebody returned the cardboard that

10  the cans were housed in, right?  So the Defendants' position is,

11  oh, you know, people returned this cardboard, you know, they

12  took care and they knew it and they returned it.  Well, they

13  could also return the cans.  We want to see how many people

14  return the can cardboard and we want to compare those two.

15          Again, this data, we're, we're -- I'm pretty

16  confident, I'm not a hundred percent confident, but this is

17  going to show the full extent of how infrequent people

18  appreciated this charge and, and giving the context from the

19  actual real-world data, which the Defendants had access to, they

20  should have known, they should have been able to analyze.  We'll

21  see if they did or they didn't or if they did it correctly and

22  what decisions they made based on that, but we should have

23  access to the same data to be able to draw conclusions from it

24  and to make our case based on that data, and we think that that

25  data's going to show that overwhelmingly people did not

1  appreciate that when the Defendants billed them for $1.30, they

2  were doing anything other than collecting the State-mandated

3  charge.

4         THE COURT:  And you think that having data about

5  charges for other types of things like cans or wine or whatever

6  else is going to allow you to make that argument more

7  convincingly?

8         MR. McINTURFF:  Absolutely.  Well, first of all, we

9  just found out they're charging a ten-cent fee on the wine, so

10 those people are class members.  I don't even know if they've

11 excluded them or not because they wouldn't tell us the query

12 that they ran to pull the data, so I'm, I'm hopeful that for the

13 people that purchased wine that they assessed the ten-cent

14 charge on that that's in the data.  I don't know that, but more

15 critically, putting that aside, the, the full data of the

16 transaction, I mean, we live in a world now where data is

17 critical for many, many things and all we're asking for is to be

18 able to see the data as it exists.

19        It doesn't contain anything privileged, it doesn't

20 contain any -- we've got a protective order, we've, we've

21 negotiated down the scope of the fields we can look at, we're

22 just looking at numbers.  It's not, it's not extra expensive,

23 especially given now that we understand that the amount at issue

24 in this case is anywhere from $10 million to many, many

25 multiples of that with statutory penalties.  It's not

1  disproportionate.  And, yes, we can look at behavior with

2  respect to cans.  That's, that's a comparator.  That's just like

3  in a, in a...an employment discrimination case.

4         We had a case -- Steven and I had a fraud case where

5  the defendant was sending out six different types of marketing

6  and one type was challenged, and we looked at the stats on the

7  other type of marketing and the stats on the other marketing

8  compared to the challenge marketing were very telling as to the

9  deceptive nature of the challenged conduct, so --

10        THE COURT:  Because -- and let me just make sure I

11  understand the point.

12        So you're -- on the cans as a comparator, you're

13  saying that your understanding is that there was no additional

14  ten-cent fee charged with respect to cases of canned beer?

15        MR. McINTURFF:  Cases of cans.

16        So one, so one example, number of, of cases of bottles

17  returned, right?  What's the number of cases with empty bottles

18  in it that were returned.  One question we could ask is, okay,

19  well, what was the number of cases with cans that were returned.

20        THE COURT:  I understand, so --

21        MR. McINTURFF:  And how does that --

22        THE COURT:  -- you're saying if --

23        MR. McINTURFF:  -- stock up.

24        THE COURT:  -- if those are similar, if the percentage

25  of cases of cans that are returned and the percentage -- to the

1  percentage of cases of bottles that are returned, you could make

2  the argument that people aren't returning the cases of bottles

3  because they knew they had an extra fee, they are just returning

4  it because that was the way they did business.  They returned

5  can cases in the same way...if that --

6          MR. McINTURFF:  Get your money back.

7          THE COURT:  -- if that's recorded in the data, and you

8  don't get any refund for the return of the can case, you just

9  get the refund for the bottle.

10          MR. McINTURFF:  Or --

11          THE COURT:  I mean, for the, for the...receptacle.

12          MR. McINTURFF:  Or, or you're returning -- the class

13  is returning this number of bottles and this number of cans, how

14  many cardboard boxes are they returning, how, how many, how many

15  individual cardboard boxes are they sending back.  Defendants

16  are collecting a fee on it, they say, they say the class should

17  know about it.  What's the ratio?  How the -- what do the, what

18  do the -- I mean, we'll build graphs to, to look at this.  How

19  can we --

20          THE COURT:  But that is --

21          MR. McINTURFF:  -- we can't --

22          THE COURT:  -- that -- hold on.

23          MR. McINTURFF:  -- build that stuff.

24          THE COURT:  Well, but you also couldn't build it if

25  there is no data on, for example, the number of can boxes that

1   are returned, because why would they keep that data if there's

2   no refund to be issued with respect to the return of a can -- a

3   box of cans.

4          MR. McINTURFF:  One, Defendant can tell us if they

5   keep that data, but more importantly, that still doesn't

6   undermine the question of look at how many people are returning

7   bottles and cans and bottles of wine and everything else and

8   look at that in the, in the grand scheme of things.

9          We want to see -- look, the Defendants are saying,

10  their main point is, oh, you should have seen it on the charge.

11  One of our points is, are you crazy?  Like, the, the size of

12  these receipts, these are busy restaurants, they're looking at

13  the -- you know, they look at the total and they pay it, and

14  we'll be able to -- we can -- if we have the full data, we can

15  make that point.

16         You know, the Defendants collected -- look, if they

17  collected -- if there's a hundred million transactions with

18  bottle charges, I mean, what are the numbers going to be in

19  terms of the overall volume of money changing hands?  And that's

20  certainly relevant to our claim that they had no obligation to

21  ferret out a ten-cent charge.  The amount of money at issue?

22  And, and, and did the Defendants know that and did they

23  appreciate it?

24         THE COURT:  Okay.  I understand the point, Mr.

25  McInturff, the various points.

1            Who's going to address this on the defense side?

2        MR. PRZYBYLKO:  I will.

3        THE COURT:  Mr. Przybylko.

4        MR. PRZYBYLKO:  Yeah, I'm going to try to keep this

5   relatively simple because I think this is a case where we have a

6   very fundamental disagreement between who has the burden of, you

7   know, demonstrating entitlement to this discovery and what they

8   need to show.

9            You know, the cases that Plaintiffs themselves cite

10  stand for the very simple proposition that they have an initial

11  burden of demonstrating relevance and if they don't do that, the

12  analysis is over, the proportionality analysis never even needs

13  to be done, and I'm referring to both the *Winfield* case they

14  cite, but I want to just sort of the *MG Freesites, Ltd.* case

15  that they cite because it's very instructive and in ways that

16  are not helpful for Plaintiffs in my opinion.  In that case,

17  there were nine categories of information requested.  The Court

18  denied discovery for eight of them, finding that the plaintiff

19  had not carried its burden of demonstrating relevance, and it

20  made the point of saying the showing that needs to be made, it

21  used words like "articulated coherently" and "not speculative"

22  and "show a concrete basis."

23            And with all due respect, I appreciate that Mr.

24  McInturff is hypothesizing many ways in which they hope this

25  data may be useful, and I understand that he's citing dozens of

Disc. Conf.          Cap 111 v. Manhattan Beer

 1  hypothetical factual scenarios from other cases he's been

 2  involved with that don't exist here, but the bottom line is they

 3  completely fail to show a concrete, articulately -- a coherently

 4  articulated need for this data.  If he wants to come back and

 5  say "we need specific data about this data trend X," he can come

 6  to us, but he hasn't done that.  What he wants is, to an invoice

 7  level, every single transaction of every single class member.

 8  That's not reasonable, he doesn't need it, and because he hasn't

 9  shown a need for it, we shouldn't be even put into a position of

10  having to explain why it's not proportional.

11          And, you know, to touch on the proportionality, I

12  mean, he says in his letter that it's -- there's no burden

13  whatsoever, it's simply a query, you know.  And he knows that's

14  not true.  He knows we've spent literally weeks working on the

15  original data production that we finally made about two weeks

16  ago, weeks of my clients' time making that query,

17  quality-checking that query.  We would have to provide samples

18  for him so he could say, well, could you do it this way, change

19  this.  We have bent over backwards to give him the data he has

20  articulated a clear need for.  He should not be able to just get

21  all data for every transaction, for every customer, with no

22  showing of need.

23          And to give you just an example before I put this to

24  rest, your Honor actually did them a service.  When you quoted

25  their letter, you said that they claimed that Defendants "need

1  to know" and then you listed off some of the examples.  They

2  didn't even claim they need to know it, they claimed it...it is

3  likely to shed light on those issues.  They don't know whether

4  it's relevant.  They claim that if their data scientist is able

5  to get it, the data and related discovery are likely to shed

6  facts -- shed light on facts that will inform questions about

7  deceptiveness.  I honestly don't even know what that means, your

8  Honor.

9          This is the classic fishing expedition.  They are

10 trying to get as much data as possible in the hopes they can

11 make some sort of use of it without satisfying their initial

12 burden of showing clear relevance.

13          THE COURT:  Okay.  Thank you, Mr. Przybylko.

14          Mr. McInturff, any final thoughts on that?

15          MR. McINTURFF:  No, I think, I think we've, we've

16 argued this.

17          THE COURT:  Okay.

18          I have reviewed the parties' letters on this issue.  I

19 appreciate the additional arguments, and I agree with the

20 Defendants' position here that the Plaintiffs have not

21 established the relevance of the additional data.  There are a

22 number of speculative thoughts that Mr. McInturff has offered

23 here as to why this information might be useful at some point,

24 and it is, of course, always possible given the iterative nature

25 of discovery that more will emerge in the course of discovery

Disc. Conf.          Cap 111 v. Manhattan Beer

1   that will allow the Plaintiffs to make a more concrete and

2   particularized argument for why this data is actually relevant

3   to the claims that they are advancing in this case, but the --

4   heh, the fact that Plaintiffs have explained the volume of data

5   that has been produced so far, if anything, I think, argues in

6   favor of that data being a very substantial and sufficient

7   amount of information to process and work through now.

8          There is certainly, I agree with the Defendants, that

9   there is a speculative quality to the argument for why this

10  additional data might have some relevance in the future, and I,

11  I don't find that the Plaintiffs have

12  sufficiently...sufficiently made clear the basis for why this

13  additional data beyond the, the transactions that are at the

14  heart of this case about the additional charges for the, the

15  cardboard boxes for the bottles or potentially other cardboard

16  box charges that are reflected in the data are relevant at this

17  time, so I will sustain the objection to the demand for

18  additional data beyond the data showing the, the fees for those

19  additional ten-cent charges.

20          MR. McINTURFF:  Could I ask one clarifying point, your

21  Honor?

22          THE COURT:  Sure.

23          MR. McINTURFF:  We had also requested in the letter,

24  because of your Honor's rules about raising disputes, we, we

25  would like to reserve our -- preserve our dispute about

1  non-class member data.

2          THE COURT:  I did see that in the footnote.  I, I

3  don't -- I mean, I'm not sure that there's any actual objection

4  to your reserving your right with respect to that, but...

5          Mr. Przybylko, was there a concern on the defense side

6  that the Plaintiffs had waived the right to pursue an inquiry in

7  the future for data for non-class members?

8          MR. PRZYBYLKO:  We -- yeah, we will agree that they

9  can raise that.  They've properly reserved that issue.

10          THE COURT:  Okay, I -- I mean, I certainly agree with

11  that, too, and I'm glad that you do as well.

12          There are -- I'm not naive to think that there won't

13  be further disputes about some of these same issues as the case

14  progresses, but that, that is -- I think both sides have pointed

15  out in various filings that discovery is an iterative process,

16  and as much as I have commended and continue to commend your

17  efforts to try to resolve as many things in an anticipatory

18  fashion as you can and as you have, there will be other things

19  that will shed different light on some of the points, even some

20  of the points that have been litigated so far.

21          So I think that addresses all of the issues, so -- the

22  Plaintiffs certainly have reserved their right with respect to

23  that point in footnote 3 of the letter that Mr. McInturff just

24  referenced, that is, ECF no. 135, footnote 3, on page 3 of that

25  filing.

1             I think that covers everything that we intended to

2  address today, but let me ask, I see that on the Plaintiffs'

3  side, there may be something I've missed.

4             Mr. --

5             MR. WITTELS:  May I, may I confer for a minute --

6             THE COURT:  Absolutely.

7             MR. WITTELS:  -- about that issue?

8             THE COURT:  You both -- all, all should.

9             (Discussion off the record)

10            THE COURT:  Okay, Mr. McInturff?

11            MR. McINTURFF:  No, that's it.  Thank you, your Honor.

12            THE COURT:  Okay.

13            Anything further from the defense side, Mr. Przybylko?

14  Mr...well, whoever's going to address it, Mr. Ripin, Mr.

15  Przybylko.

16            MR. RIPIN:  Yes, your Honor, we just -- obviously, if

17  they've preserved their right to at some future time raise that

18  issue of that non-class member data, we're obviously preserving

19  our right if they do raise it to, to object and oppose their

20  request at a future date.

21            THE COURT:  Of course.  I think that actually goes

22  without saying, but, fine, you've said it, so that's clear.

23            Anything further, then, from the defense?

24            MR. RIPIN:  Other than that, I have nothing further,

25  your Honor.

1          THE COURT:  Okay.

2          Let's pick a date for our next conference.  I think we

3   should have a control date just because there may be further

4   issues that will come to light, and obviously it will depend on

5   what Judge Seibel does in her ruling on August 31st if the case

6   is dismissed at that point, then obviously no further conference

7   will be necessary, but I think that it makes sense to put

8   something on the calendar in case we need it just to at least

9   have a control date to come back and address further disputes.

10          I'm inclined to set that for the first week of October

11   unless somebody thinks that somebody -- that we should have a

12   date sooner than that.  I'm open to hearing that you think we

13   should have an earlier date because there are other things in

14   the pipeline that you expect to start raising, but I, I'm

15   thinking the first week of October.

16          I will be candid with you, I have a trial scheduled

17   for that week.  The parties have told me numerous times that

18   that case is likely to settle and I've chosen to believe them

19   and have started scheduling other things for that week, but

20   there is some possibility that that trial will go forward, in

21   which case, we'd obviously have to reschedule, so first question

22   is, is that week available, second question is does anybody

23   think we should come back sooner than that.

24          Mr. McInturff, I'll start with you.

25          MR. WITTELS:  Judge, Judge, I just --

Disc. Conf.          Cap 111 v. Manhattan Beer

1          THE COURT:  Or Mr. Wittels.

2          MR. WITTELS:  -- spoke to Mr. McInturff.  I have a --

3  I will actually be out of the country that week on a --

4          THE COURT:  Okay.

5          MR. WITTELS:  -- pre-planned trip, that first week in

6  October, so --

7          THE COURT:  Okay.

8          MR. WITTELS:  -- if it could be the following week,

9  towards the end of the week, if it works for you and counsel.

10          THE COURT:  Okay.  That is -- okay, so -- and implicit

11  there is you don't think an earlier conference is necessary.

12          MR. WITTELS:  I, I guess it sort of depends on the --

13  Judge Seibel's ruling and then we can...decide --

14          THE COURT:  Okay.

15          MR. WITTELS:  -- in terms the other issues.

16          MR. McINTURFF:  I will say, from, from the sort of the

17  view from the trenches here, we don't have any particularly

18  intense disputes right now.

19          THE COURT:  Okay, and, look, we could always come back

20  sooner.  I mean, this is just a best guess as to when we should

21  have our next conference.

22          Mr. Przybylko, so we're looking now at the second week

23  of October.

24          MR. PRZYBYLKO:  I'm fine on everything but the Friday

25  of that week.  Well, actually, I'm sorry, Monday of that week is

Disc. Conf.                 Cap 111 v. Manhattan Beer

 1  --

 2              THE COURT:  A holiday, right.

 3              MR. PRZYBYLKO:  Right, so I'm fine for the 10th

 4  through the 12th of that week.

 5              THE COURT:  Okay.

 6              Mr. Ripin?

 7              MR. RIPIN:  Yeah, that's fine, your Honor.

 8              THE COURT:  Okay.  We could do Wednesday, ten-thirty,

 9  or Thursday at nine-thirty.

10              Any preference, Mr. McInturff?

11              MR. McINTURFF:  Well, if it's only those two --

12              THE COURT:  I mean, I -- it doesn't necessarily have

13  to be only those two.

14              MR. McINTURFF:  My preference would be to do it on the

15  13th if that's possible, but if that is not possible --

16              THE COURT:  Mr. Przybylko said he's not available on

17  the 13th.

18              MR. McINTURFF:  Oh, he's not available.  Could we do

19  eleven o'clock on the 12th?

20              THE COURT:  Yes.  I have something I have to attend in

21  Manhattan that day, hopefully, and I'm on criminal duty that day

22  as well, so it's a little tricky.  I would prefer to do the 11th

23  if we could, and that's why I suggested earlier on the 12th

24  also, so eleven on the 12th is not really ideal for me for a

25  variety of reasons.

Disc. Conf.            Cap 111 v. Manhattan Beer

1            MR. McINTURFF:  Okay.  The -- then let's do --

2            THE COURT:  I can do other times on the 11th, though.

3            MR. McINTURFF:  Let's do nine-thirty -- my personal

4    issue is I'm traveling on the 10th and I'm not going to get in

5    until the evening of the 10th.

6            THE COURT:  Okay.

7            MR. McINTURFF:  And so whatever time works for your

8    Honor on the 12th.

9            THE COURT:  Okay, so can we do nine-thirty on the

10   12th?  Does that work on the defense side?

11           MR. PRZYBYLKO:  Sure.

12           THE COURT:  Okay.

13           Let's plan to have that be in person because history

14   suggests there will be things for us to discuss, but if there's

15   nothing that's imminent...I know I have one outstanding issue to

16   address with you, so in case I don't address it before then,

17   let's plan to be in person at nine-thirty on the 12th.  If we

18   get to the 10th and it doesn't seem like there are any other

19   issues, then we can consider whether to convert that to a

20   telephone conference, but we'll plan to reconvene here at

21   nine-thirty on Thursday, October 12th.

22           All right, with that said, we'll stand adjourned for

23   today.  I hope everybody enjoys the rest of the summer and any

24   travel plans you have between now and October 12th.  And that's

25   all.  We'll stand adjourned.

Disc. Conf.                 Cap 111 v. Manhattan Beer

1              Take care, everybody.

2              MR. PRZYBYLKO:  Thank you, your Honor.

3              MR. RIPIN:  Thank you, your Honor.

4

5   Certified to be a true and accurate

6   transcript of the digital electronic

7   recording to the best of my ability.

8   _____

9   Tabitha R. Dente, RPR, RMR, CRR

10  U.S. District Court

11  Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25