# Exhibit C

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------------x
    CAP 111 ENTERPRISES LLC,
3
                        Plaintiff,
4
            -against-                    22 CV 1408 (CS)(AEK)
5                                        Conference

6

7   MANHATTAN BEER DISTRIBUTORS
    LLC and SIMON BERGSON.
8

9                        Defendants.
    ------------------------------------x
10

11                              United States Courthouse
                                White Plains, New York
12                              April 24, 2023

13

14

    B e f o r e:  THE HONORABLE ANDREW KRAUSE,
15                              United States Magistrate Judge

16

17

18  WITTELS MCINTURFF PALIKOVIC
            Attorneys for Plaintiffs
19  BY:  STEVEN WITTELS
         J. BURKETT McINTURFF
20       ETHAN ROMAN

21

22  DAVIDOFF HUTCHER & CITRON LLP
            Attorneys for Defendants
23  BY:  ERIC PRZYBYLKO
         PETER RIPIN

24

25  **Proceeding recorded via digital recording device**
```

1          THE DEPUTY CLERK:  This is the matter of Cap 111

2    Enterprises LLC v. Manhattan Beer Distributors, Docket Number

3    22CV1408, the Honorable Andrew Krause, presiding.

4          Counsel, note your appearance for the record,

5    starting with counsel plaintiff's counsel.

6          MR. WITTELS:  Steven Wittels for plaintiffs and the

7    proposed class.

8          Good morning, your Honor.

9          THE COURT:  Good morning, Mr. Wittels.

10         MR. McINTURFF:  Burkett McInturff for plaintiffs in

11   the proposed class.  Good morning.

12         THE COURT:  Good morning, Mr. McInturff.

13         MR. ROMAN:  And Ethan Roman for plaintiffs in the

14   proposed class.  Good morning, your Honor.

15         THE COURT:  Good morning, Mr. Roman.

16         MR. RIPIN:  Good morning, your Honor.

17         Peter Ripin from Davidoff Hutcher & Citron for the

18   defendants.

19         THE COURT:  Good morning, Mr. Ripin.

20         MR. PRZYBYLKO:  And Eric Przybylko also for the

21   defendants.

22         THE COURT:  Good morning, Mr. Przybylko.

23         Okay.  It's nice to meet all of you in person or in

24   any fashion the first time.

25         We'll be going back and forth on a lot of different

1    issues today.  You're welcome to stand to address the Court if

2    you would like to.  You're also okay to sit if you prefer.  I

3    know some lawyers feel like they can't keep themselves in their

4    seat when it's time to address the Court.  So really it's up to

5    you.  But it to would be fine with me if you want to sit so

6    you're not having to pop up and down.

7           Just make sure whether you're standing or sitting

8    that you're speaking directly into the microphone because we

9    are making a recording of this proceeding.  As you can see, we

10   don't have a court reporter.

11          You'll be able to order the transcript.  I advise you

12   to order the transcript.  It probably will be helpful because

13   we're going to go through a lot of disputed issues.  To the

14   extent you have any objections to any of my rulings that you

15   want to take to Judge Seibel pursuant to Rule 72, you'll need

16   the transcript for that certainly.  Not saying you will

17   necessarily have to do that, but that is how we will go about

18   it because I do intend to rule, I would expect, on many of

19   these issues, if not all of them, after hearing further

20   argument from the parties today.

21          Since this is our first conference after Judge

22   Seibel's order of reference, let me just go through a few

23   things at the outset.

24          First, as you've probably seen, I did issue my

25   standard discovery protocol order in this case on docket at ECF

1  Number 60.  The deadlines and procedures set forth in my order

2  are pretty closely aligned with Judge Seibel's standard case

3  management plan.

4        There might be a couple of minor differences.  I

5  haven't studied them side-by-side recently, but to the extent

6  there are any differences, since this matter is now before me

7  for all discovery-related issues, you should follow the

8  deadlines in my case management plan.

9        I know we're sort of in a bit of a hybrid situation

10  with this case because you have matters that are currently

11  pending before Judge Seibel.  There's a motion to dismiss,

12  which obviously will have an impact on the discovery as we move

13  forward.  I know there's been recently another motion to

14  supplement the second amended complaint, because that is

15  intimately tied with the motion to dismiss, and the issues

16  related to the challenge to the claims.  In the first place,

17  Judge Seibel is handling that.  As you have seen, she issued an

18  order deferring decision on that.  So she and I will be in

19  touch as needed about different aspects.

20        If there's any confusion about who's handling what,

21  we'll figure that out and try to report back to you and try to

22  give you as much clarity as possible.  But as a default matter,

23  you should expect that any discovery-related issues for the

24  remainder of this case will come to me and so you should follow

25  my standard discovery protocol order for that purpose.

1              Now, I often tell the parties at these initial

2    conferences about my standard form, confidentiality and

3    protective order, but I know there's already a confidentiality

4    and protective order in place in this case.

5              I will point out that the order of reference for

6    general pretrial supervision does include within it an order of

7    reference for settlement.  So if there comes a time when the

8    parties would like to have a settlement conference with the

9    Court, I'm certainly open to that and willing to assist you

10   with that, if it will be helpful.  I'm sure we're not at that

11   point yet since we haven't even started producing documents and

12   there's the motion to dismiss pending.  But as this case

13   progresses, I suspect we're going to be seeing each other with

14   some frequency.  So if there comes a point where you think

15   having a settlement conference would be a worthwhile exercise,

16   talk to each other about it, let me know.  You don't have to go

17   back to Judge Seibel and request a separate order of reference

18   for settlement purposes.

19             So I've reviewed the docket, which is fairly lengthy,

20   given that we haven't even started producing documents yet, but

21   I understand why that is with multiple amended complaints and

22   the motions and various other things.

23             Just to make sure I'm clear, it's my understanding

24   that discovery is moving forward with respect to documents and

25   written discovery, but that depositions and expert discovery is

1 essentially stayed pending resolution of the motion to dismiss.

2 I see nodding heads.

3   Mr. Wittels.

4   MR. WITTELS:  Yes, your Honor, that's correct.  On

5 the initial conference we had with Judge Seibel -- well, maybe

6 more than one -- but where defendants proposed they would file

7 a motion to dismiss, we did ask the Judge could we continue on

8 or at least get discovery started, because regardless of

9 whether the case remained in federal court or state court,

10 there would be discovery needed.  Quite a bit, actually.

11   So she said yes, you can get started on the written

12 discovery.

13   THE COURT:  Okay.  And we have a feature in this case

14 which we don't see in every case where you actually have a

15 deadline for the beginning of document production, which I know

16 we've extended, and the deadline for the end of document

17 production.  I actually find that to be helpful, so we're not

18 in a complete black hole of wondering when the documents are

19 coming and what the schedule is going to be for that.  But I

20 understand that you've negotiated that.  We've made a couple of

21 adjustments so the document production is currently scheduled

22 to begin on May 8 and end on August 31.  It's going to be a

23 rolling production with productions coming at least every 21

24 days, if not more frequently than that.

25   How am I doing so far?

 1          MR. WITTELS:  It's accurate, your Honor.

 2          THE COURT:  Okay.  Good.

 3          Mr. Ripin, if there's anything you want to weigh in

 4   on, please do.

 5          The ESI protocol, we've extended the deadline for

 6   that a couple of times.  That's currently due on Friday.  I

 7   understand you're still working on outstanding issues.  There

 8   may be disputes.  If there are, we'll come to that at the end.

 9   If there are disputes on that, we'll come back and talk about

10   them at our next conference in short order because, obviously,

11   we'll only get that in place before we get too far into this

12   rolling production period.

13          The last thing I'll mention is I've reviewed all of

14   the letters that pertain to the discovery disputes.  Those are

15   at ECF Numbers 53, 54, 55, 62, 63, and 64.  And as I understand

16   it, the issue that was raised in ECF Number 55, defendants'

17   letter motion has been resolved per the letter that I received

18   from plaintiffs on March 27.  That's ECF Number 64.

19          So that issue is fully resolved; is that correct,

20   Mr. Ripin?

21          MR. RIPIN:  That's correct, your Honor.

22          THE COURT:  Okay.  That is everything that I wanted

23   to just mention at the outset in terms of my familiarity.  I

24   have read the complaint also, so I understand the general

25   contours of the allegations, which is why I understand why

1   there is a case of beer on the table.  I do appreciate the

2   visual aid for purposes of understanding some mechanics of

3   exactly what's in dispute.

4            If there's another reason, though, you've brought

5   that, you could let me know, Mr. Wittels.

6            MR. WITTELS:  Actually, it's empty, your Honor.

7   Although we would go to the car and (indiscernible).

8            THE COURT:  I think that's fine for 11:08 on Monday

9   morning but thank you.

10           Okay.  So I'm ready to jump right in to the discovery

11  disputes.  I will mention, by the way, only because I was

12  having a conversation about it with some colleagues last week,

13  one or more of the letters referred to me as Magistrate Krause.

14  My proper title is Magistrate Judge.  There are people who are

15  Magistrate Judges who get very agitated about that.  I am not

16  one of those people, just to be clear.  I don't even remember

17  who did it.  It does not matter to me all that much.  But for

18  future reference, the proper title of the United States

19  Magistrate Judge is Magistrate Judge.  That changed at some

20  point, I don't know, 30 years ago, and there are people who

21  were involved in ensuring that that change was made that feel

22  very, very strongly about it.  That's something I've learned in

23  my two-and-a-half-years on the bench.  So I just point that out

24  to you for future reference.

25           Those who advocate on this issue would say that

1    referring to a Magistrate Judge in federal court as Magistrate

2    would be akin to referring to a District Judge as District,

3    which of course no one would ever do.  You can say Magistrate

4    Judge, you can just say Judge, but you shouldn't just say

5    Magistrate.

6            So again, I hold that against nobody.  As I said, I

7    truly don't remember even which letter it was, but I noted it.

8    And because it was fresh in my mind, I thought I'd point it out

9    to you.

10           All right.  So let's turn to the issues in the

11   letters.  I have reviewed the letters.  I've reviewed the cases

12   that you've cited in the letters.  There are a couple of

13   different buckets.  Obviously, the letters are broken up to

14   discussions, on the plaintiff's side, into discussions about

15   interrogatories and document demands, although there's one

16   large category that really cuts across both, the

17   interrogatories and the document demands.

18           So let's start with the large category of materials

19   that I think can fairly be described as the discovery on

20   discovery types of documents and interrogatories.

21           I understand very well the reason why plaintiffs are

22   looking for that information, to try to facilitate an informed

23   discussion about where information can be located, which

24   witnesses are going to be most relevant for assessing the scope

25   of productions, and really getting at the heart of the

1  substantive issues in the case, but I don't know that I've ever

2  seen a case where these types of interrogatories and document

3  demands have been propounded at this stage, where we haven't

4  even had any document production, we haven't had any reason to

5  believe that the defendants' productions are going to be

6  inadequate in any way or any gaps in the production can be

7  identified.  The productions haven't even started yet.

8           So I start from the premise that I typically see

9  these types of requests after we've run into problems along the

10 way, and that is a framework that has been discussed by many

11 judges within this district.  There's the case that was cited

12 in the defendants' letter from Judge Liman, which, interesting,

13 that's the *Haroun* case, 20CV100 2020 WL 6828490, which is a

14 case I wasn't reading for the first time in connection with

15 this set of disputes.  Interestingly, I noticed that the

16 plaintiffs made reference to my colleague, Judge Parker, who's

17 issued various orders on ESI and is a very sophisticated

18 thinker on this set of issues, but it's worth noting that a

19 couple of the key cases cited by Judge Liman in *Haroun* are

20 Judge Parker decisions that, frankly, cut against plaintiff's

21 position here.  So I'll just point all that out.

22           I'll turn to you, Mr. Wittels.  You can hear my

23 skepticism about this line of inquiry at this stage, but tell

24 me why this is the case where we should have this kind of

25 discovery up front.

1            MR. WITTELS:  Judge, if it's all right, I'll have

2    Mr. McInturff address this.

3            THE COURT:  Absolutely.

4            Mr. McInturff.

5            MR. McINTURFF:  Good morning, your Honor.  Burkett

6    McInturff.

7            First, just a global point.  Your Honor's points are

8    well taken, and I will say the parties have approached ESI with

9    transparency thus far.  To preview a bit, we do have a limited

10   number of disputes on ESI protocol that, generally speaking,

11   from my perspective, this is not a case where we have widely

12   divergent world views about how discovery is going to take

13   place.  And I say that because what we've worked out is a

14   transparent process where we discuss and negotiate collection,

15   custodians, et cetera.

16           And the best analogy I've heard for this type of

17   discovery planning process is Go Fish.  And when the defendant

18   is holding all the cards about the information and we are in a

19   position to negotiate the ESI custodians and the non-custodial

20   data sources, et cetera, if we don't have information about the

21   underlying data in the background, we can't ask for what we

22   believe, in terms of good faith negotiations, we can't ask that

23   data be collected.

24           Now, how do you solve that?  The vast majority of

25   cases solve that on the other end.  We find the doc, we find

1    the source, then we approach the defendant and we say collect

2    the -- now collect the source.  We know it exists.  That

3    obviously works in many cases.  It is much more expensive to do

4    it that way.  It's more time consuming.  It leads to longer --

5                THE COURT:  For both sides, frankly.

6                MR. McINTURFF:  Correct.

7                And were this not a case where the parties are both

8    well advised and sophisticated and are having fruitful

9    discussions, the front-loading of ESI discovery could be more

10   difficult.  But I don't believe that that's the case here and I

11   think Judge -- and I think that explains why both in Judge

12   Parker and in Judge Francis' jurisprudence before that, there

13   are conflicting rulings because each case presents a different

14   scenario.

15               We've litigated before Judge Parker in a very large

16   class action and she implemented sort of a hybrid of what we're

17   proposing.  And I'll note what we're proposing comes from the

18   Sedona Conference's Jumpstart Outline, which was endorsed, has

19   been endorsed by the Federal Judicial Center.

20               The case we cited that we're relying on most is Judge

21   Francis' most recent articulation of these principles.  And I

22   think, I think he hits the nail on the head, which is, we're

23   going to have transparency and cooperation, but without,

24   without transparency, cooperation doesn't hold the same weight

25   as expected.  And the other big principle here is 26(g) is the

1   reasonable search and getting to striking the right balance

2   between proportionality and outcome.  And we think here, if

3   we're able to understand more about the defendants' electronic

4   systems in advance, we'll have a more fruitful conversation and

5   we won't have to do as much on the back end.

6           That said, we know how to do it both ways.  But I --

7   we've had success in front-loading ESI and not having to go

8   back and do multiple collections.  I mean, I can't make any

9   promises, obviously, but we've had success with this method in

10  the past, and that's why we issued the discovery we issued.

11          I will say I've had cases where both my colleagues on

12  the plaintiff's side and my adversaries on the defense side

13  viewed this exchange of information as not even necessary to

14  issue formal discovery as part of the 26(f) discovery plan

15  process.

16          So I mean, ultimately it depends on how the Court

17  wants to manage the case, and we're fine with however the Court

18  sees fit to do that.  I do think that there are benefits to

19  front-loading these issues, especially when you have counsel

20  that understand them.

21          THE COURT:  All right.  Well, look, that's the best

22  case for it, Mr. McInturff.  I appreciate that.  Thank you.

23          Mr. Ripin, let me turn to you.

24          MR. RIPIN:  Yes.  Thank you, your Honor.

25          Your Honor referenced the *Haroun* case and the *Haroun*

1    case is sort of consistent with all of the other cases out

2    there when dealing with this issue.  Courts consistently

3    require the parties seeking this discovery on discovery to

4    provide an adequate factual basis to justify the discovery and

5    they closely scrutinize the requests in light of the danger

6    of -- and this is quoting now -- in light of the danger of

7    extending the already costly and time-consuming discovery

8    process ad infinitum.

9           Courts have also held that the producing party is in

10   the best position to evaluate the procedures, methodologies,

11   and technologies appropriate for preserving and producing their

12   own ESI.  As a result, courts have not micromanaged the

13   parties' internal review processes and they've not permitted

14   discovery on discovery in the absence of evidence of good

15   cause, such as a showing of gross negligence in the review and

16   production process, the failure to produce relevant specific

17   documents known to exist and likely to exist, spoliation, other

18   malfeasance or deficiencies.

19          Here, as your Honor noted, we haven't even started

20   producing documents yet.  They've made no such showing.

21   Discovery has just begun.  Neither side has produced anything.

22   And in the *Haroun* case, what the Court stated was that -- and

23   they were already well into it at that point -- but the Court

24   stated if there were gaps in the production of ESI, then what

25   -- and I'm going to quote now, because counsel referred to the

1   sources, knowing the sources -- and then the Court says,

2   contrary to the plaintiff's assertion, plaintiff does not need

3   to know all of defendants' sources of ESI to determine whether

4   documents have been deleted, and if so, whether they may be

5   available from another source.  What the Court said, the

6   plaintiffs could inquire at depositions if there was a

7   deficiency or a suspected deficiency it was a more appropriate

8   procedure to inquire of the deponent, the 30(b)(6) deponent,

9   whether documents that had not been produced or there were

10  obvious gaps in the production.  We have spent -- when you talk

11  about transparency, and I thank counsel for his statement,

12  we've worked in a collaborative manner, frankly, for over two

13  months now to negotiate the ESI protocol, we're just about

14  there.  We're just about -- you know, there may be one or two

15  issues outstanding.  But after a lot of effort, a lot of meet

16  and confers, good faith on both sides, we have worked it out.

17         So I think the rationale that they need this

18  information for purposes of entering into an informed protocol

19  and transparency, I think it just doesn't apply in this

20  situation.  We've been very transparent, but in the absence of

21  any showing or -- which there couldn't be since we haven't

22  started producing documents, of any deficiencies in a

23  production, I think at this stage it's just not appropriate.

24         THE COURT:  Okay.  You left out one of my favorite

25  quotes from *Haroun*, though, Mr. Ripin, which is when Judge

1   Liman writes, as a practical matter, the party who engages in

2   the collection, review, and production of ESI, without

3   conferring in advance with her adversary, proceeds at her

4   peril.  If it turns out that the production was not reasonable

5   and proportional, she might have to do it again.  But I think

6   you understand that, and I think both sides understand that

7   here.

8          Look, Mr. McInturff, I take the point that there are

9   cases where the parties mutually agree that having a more

10  robust exchange about this at the outset, even perhaps without

11  the need for formal discovery demands or interrogatories, is

12  beneficial to the process.  And that is to be commended in a

13  lot of ways, because I think that can lead to much greater

14  efficiencies.  But the state of the case law, I think, is

15  pretty clear that in the absence of that type of voluntary

16  agreement to proceed in that way, the process really needs to

17  start the other way and the more, what I'll refer to as the

18  more traditional way, which is, give the defendants, to some

19  extent, or the producing party, because it could be true of the

20  plaintiffs, too, the benefit of the doubt and the trust in

21  counsel's compliance with the obligations of the Federal Rules

22  when it comes to discovery and counsel's education of the

23  clients as to those obligations and work through those issues

24  as they come up later on in the process.

25          So the last part of that quote from Judge Liman is

1    instructive as well.  If a party decides not to turn over the

2    sources of its ESI, the Court may not require it to do so

3    without an adequate factual basis.  And that is the way I view

4    the situation in this case, especially given where we are, at

5    the very beginning.  I commend you all for working together so

6    far and working out some issues, and whatever issues you can't

7    work out, you'll bring to me and I'll help work through them

8    and resolve them.

9            I always like to praise and encourage the

10   collaboration and efforts of counsel when they seem to be

11   fruitful and, look, when you get to an impasse, that's what

12   there are judges for.

13           So, here, I am going to sustain the objections from

14   the defendants to this group of interrogatories and document

15   demands regarding discovery on discovery.  In other words,

16   sources of -- what's referred to in various places as ESI

17   source transparency, knowledge of IT systems, ESI preservation

18   efforts, individuals who are recipients of litigation holds,

19   individuals with access to relevant file shares, potential

20   witnesses.  That really includes interrogatories 7 through 9,

21   11 through 15, 3 and 4, 6, 8, 10, and 11.  I know I jumped all

22   over the place with those numbers, but I was following the way

23   you put them together in your letters.

24           Those are all in the realm of this type of discovery

25   on discovery I think is premature at this stage.  Obviously,

1   those objections are sustained, but without prejudice to

2   renewing those interrogatory requests come some future point in

3   discovery if it turns out that you've reached an impasse and

4   there is actually an adequate factual basis to require

5   defendants to turn over that type of material to ensure that

6   the plaintiffs have access to all of the discovery to which

7   they are entitled.  That also covers the requests for

8   production numbers 20 through 27 as well.

9        All right.  There are a few other issues that didn't

10  fall specifically within that framework.  I wanted to start

11  with that, because I've covered many of the disputes, but there

12  are some other things to talk about.

13       I will note, by the way, just as a last point on

14  this, that while I'm not requiring the disclosure of the

15  litigation hold recipients, that does seem like something that

16  could be a useful tool to facilitate discussions in terms of

17  understanding who the right witnesses and custodians should be

18  both for documents and depositions down the road.  You know,

19  I'm not sure that I've seen a specific request along those

20  lines.  I thought it was a creative idea and way of approaching

21  it.  I understand the objections and I've already sustained the

22  objections.  I'm not trying to split the difference on that

23  one.  I just thought I would point out that from where I sit

24  that seemed to be an interesting and creative way of trying to

25  get at the issues and one of the less intrusive and burdensome

1    requests at this stage of the process.

2            Do with that what you will, Mr. Ripin.  I'm not sure

3    if you wanted to make any disclosures along those lines, but I

4    just thought I'd mention that, since we were talking about it.

5            Okay.  Let's talk about some of the other issues that

6    were raised.  I'm going to jump around a little bit because

7    these other issues kind of -- are not as intertwined with one

8    another.

9            Let's talk about the relevant date range.  That was

10   an issue identified in the letter motion at ECF Number 54.  I

11   understand that the relevant class period goes back to January

12   or February of 2016, looking back six years.

13           What the plaintiffs seem to be looking for is an

14   expanded scope on the date range because it's the plaintiff's

15   position that some of these practices started much earlier in

16   time.  I understand part of the response from the defendants

17   is, well, they've known about that for a long time.  They've

18   known that these practices have been in place earlier than 2016

19   from prior to depositions or whatever else the case may be.

20           I'm not sure when the plaintiffs learned about the

21   age of the practices is all that relevant to our discussion

22   here today, so I think we can just set that aside.  I mean,

23   they're asking for this now.  Whether they could have asked for

24   it earlier is sort of immaterial, because they could always

25   submit new document requests or amend their current document

1 requests.

2          But what I do find salient about the defendants'

3 response is that there are certain requests, numbers 5 through

4 8, where even in the original requests there were no time

5 limitations.  Those -- I don't have 5 through 8 because you

6 didn't provide me with the complete set of document demands, it

7 was just the ones that you were focused on, I think.  But I

8 think I have 5 and 6, so that gives me a flavor, at least, of

9 what 5 through 8 would be.  If I've missed them in the papers,

10 you can point them out to me and I apologize for overlooking

11 that.

12          MR. RIPIN:  I think, your Honor --

13          THE COURT:  Were they attached to yours?

14          MR. RIPIN:  Yeah, in Exhibit A to our, one of our

15 letter responses.

16          THE COURT:  I see.  There they are.  And you even

17 underlined them for me.

18          But you only gave me the requests.  You didn't give

19 me the responses.

20          MR. RIPIN:  Correct, your Honor.

21          THE COURT:  Right.  So I don't know exactly what your

22 responses were.  You represented to me that you didn't seek to

23 limit the date range.

24          MR. RIPIN:  That's correct.

25          THE COURT:  So for future reference, it would be

1    helpful for me to have the responses, because presumably you

2    restated the question in your response anyway.  So it's always

3    easier to have the responses because then I get both sides'

4    position on the issue.

5              But in any event, those requests seem to go to the

6    heart of what plaintiffs are looking for in terms of the older

7    documents.  That is to say, documents and communications

8    regarding the development and implementation of Manhattan

9    Beer's 10-cent deposit fee.  Documents and communications with

10   Manhattan Beer management or governing bodies regarding

11   disclosure of the 10-cent deposit fee.  Documents sufficient to

12   identify the person or persons responsible for the development

13   and implementation of the 10-cent deposit fee for cardboard.

14   And documents and communications with Manhattan Beer management

15   or governing bodies regarding whether or not to charge certain

16   customers or groups of customers the 10-cent deposit fee.  For

17   those, there's no time limit.

18             So to the extent the point from the plaintiffs is

19   these policies have been around for a really long time so we

20   should be able to go back further in time.  Well, in terms of

21   the development and implementation of the policies and who was

22   charged and what went into that, you're already getting those

23   documents going back a greater period of time, which means

24   inevitably that the searches that the defendants are going to

25   have to undertake will include searches that go beyond the

1    January, February 2016 time range anyway.

2              It's not clear to me why you would necessarily need

3    that broader time range to be applied to all of the document

4    demands in the entire set of requests.

5              MR. McINTURFF:  Could, your Honor, this is Burkett

6    McInturff.

7              THE COURT:  You can bring the microphone closer to

8    you so you don't have to lean in.

9              MR. McINTURFF:  To me, just to clarify one point,

10   when we -- the proposal that is on the table from plaintiffs is

11   you don't have to do this for email.  We just want you to do it

12   for the paper documents and the electronic files that you're

13   already searching that are responsive to the larger set of

14   document requests.

15             So the example we gave to defense counsel is you're

16   looking through a file archive and there is a document in the

17   archive that is potentially responsive, but it has a last

18   edited date that is before January 1, 2016.

19             THE COURT:  I understood the way you framed it.  It's

20   just that potentially responsive is defined in part in relation

21   to the date range.  I mean, what makes it responsive or not

22   responsive in part is when it was created or last edited.  So

23   with respect to these four categories, which are broadly

24   phrased, and as I understand it, though I don't have all of the

25   responses, defendants have not -- defendant has not objected to

1   on the grounds of an overbroad time limitation, you're going to

2   get that stuff anyway.  It's just all the other categories such

3   as damages-related information or database information from

4   2014 or 2013 or 2012.  I mean, why do you need that?

5           MR. McINTURFF:  Well, it's actually -- it's more

6   related to answering the question of what do the defendants

7   know and when did they know it and it's not -- we're not

8   focused on that type of information, we're focused on, for

9   example, complaints by large companies that spotted this fee

10  and were able to get out of it.  Different, different conduct

11  that occurred during the multi-year course of the challenged

12  conduct, and again, if it is saved alongside otherwise

13  responsive documents.

14          They're going to be looking for documents that

15  generally fall into the category of, you know, what did you

16  know and when did you know it.  And yes, there's the

17  implementation period, but then there's what information they

18  got from customers, competitors, internal whistleblowers during

19  the relevant period and if it's -- if it's there, and the

20  answer that we discussed it during one of the meet and confers

21  was what if the relevant memos are in folders labeled by year,

22  2015, 2014, 2013?

23          And our response was, if you have a folder that you

24  believe contains relevant information and you're collecting

25  2018, 2017, and 2016, and there's 2015 to 2012 sitting right

1    next to it, we should go ahead and collect that, because you've

2    already made the determination that there are responsive

3    documents within this -- within this sort of sphere, and it

4    doesn't make sense from a practical standpoint now that we know

5    that this started in the '80s, and again we're not asking for

6    them to go back for email because the volume of data is going

7    to be quite large.  So it's to capture paper and ESI that is

8    already kept in the ordinary course.

9            And we don't think that that is -- we think that's a

10   fair balance at this stage of the case given the revelations

11   about how long the conduct has gone back.

12           THE COURT:  Okay.  But let me just ask you a more

13   precise question.

14           Are there specific document requests for which you're

15   seeking this older information?

16           MR. McINTURFF:  Yes.

17           THE COURT:  And others for which you are not seeking

18   the older information?  Sounds like the answer to that should

19   be yes.

20           MR. McINTURFF:  The answer is yes, but it really

21   depends on how the document is housed.  So for example, the

22   database --

23           THE COURT:  Why does it depend on that as opposed to

24   what the substance of the request is?

25           MR. McINTURFF:  Fair enough.  I mean, it's a fair

1    point.  I was trying -- I'm trying to minimize their burden,

2    but your Honor's point is a fair point.

3             THE COURT:  Because when you said if they're already

4    looking for a particular type of document that would go to the

5    question of what they knew and when they knew it, they're going

6    to be looking in certain places for that but not other places.

7             MR. McINTURFF:  Correct.

8             THE COURT:  Okay.  So it would seem to me that

9    perhaps a compromise on this would be -- look, there are

10   already four categories of documents, broad categories, too, by

11   the way, where defendants are already going to be looking for

12   some larger period of time.  There's no time limitations.  I'm

13   not sure if you separately negotiated what that time limitation

14   should be, going back to the beginning of the earth or it gets

15   just goes back to 1990 or 2010.  I don't know.

16            But one possible path forward, it would seem to me,

17   is if there were specific requests for which you were looking

18   for older information, that is, information that predates 2016,

19   then the defendant might be able to consider those requests

20   individually, because there might be a more compelling argument

21   to say, yes, 2016 information may be relevant for X, Y, and Z

22   categories because it goes to knowledge, but it's not required

23   or not relevant for A, B, and C categories because those really

24   go to damages.

25            So let me hear from you on that, Mr. Ripin.

1      Obviously, I understand your concern about going back too far.

2      I understand the point about the categories you've already

3      agreed to go back further on, but it seems at least possible to

4      me that there may be a middle ground here where there are

5      certain categories where a pre-2016 search would be

6      appropriate.

7                  MR. RIPIN:  Your Honor, we -- the objection that we

8      had, which is the one your Honor articulated, that this broader

9      time range was being applied to all of the requests.  I mean,

10     we went back and forth on the meet and confer on this, and the

11     only answer we had was, well, if you're in that, you know,

12     closet and there's another folder there, it's easy -- easily

13     accessible to collect.  But the burden is in connection with

14     the review.  It's driving up the cost for additional review

15     time.  We haven't had the discussion about specific requests.

16     I think it's certainly a reasonable ask.  We never got there.

17                 THE COURT:  I mean, the other part of the burden is

18     how many closets do you have to look in?  And if there are

19     closets that are adjacent to one another, just to use the

20     metaphor, I mean, if there are closets adjacent to one

21     another -- I'm thinking of my last office where I had a

22     litigation closet and, you know, it had two sets of doors.

23     When I filled up one of them, I had to go to the next one.

24                 But are we saying if all the documents from one

25     period of time are in one closet you don't have to search the

1    adjacent closet?  I mean, that seems like an arbitrary cutoff

2    point.

3           The question to me is, what is actually substantively

4    potentially relevant from the pre-2016 period.  Because I could

5    very well imagine if I were presented with these objections or

6    these requests by way of a motion to compel, that I might view

7    them differently for different types of requests.

8           So it's not really just a matter of where you're

9    looking, it's a matter of what you're looking for and why

10   you're looking for it.  So on that one, you'll learn as you get

11   to know me that it's not my interests necessarily, I'm not

12   looking to just automatically kick things back to you, but at

13   the same time I don't want to issue a ruling that is imprecise

14   or it doesn't really address the nuance of the particular

15   issue.

16          So on this one I am going to send it back to you for

17   further discussion to see if you might be able to figure out if

18   there is a narrow set of additional requests beyond the four

19   for which the defendant has already agreed to search a broader

20   time period, where the plaintiffs are really interested in the

21   earlier documents and have a good faith basis for suggesting

22   that those documents have relevance to the claims at issue in

23   this case.

24          So that should be the subject for the meet and confer

25   discussions, and you can report back to me at the next

 1  available opportunity as to the scope there.

 2          All right.  Let's turn to the issue of complaints,

 3  since that was alluded to briefly in that last argument.  The

 4  defendants' position is complaints other than with respect to

 5  cardboard box deposits are a fishing expedition.  That is a

 6  fairly narrow position, I would say.  But the plaintiff's

 7  position that we should have all complaints because we don't

 8  know how customers might have referred to the issue that we are

 9  now focused on in this lawsuit certainly seems like an

10  overbroad request.  So this may be another one where I'm going

11  to encourage you to talk further about it.

12          I'm not sure if there's a set of key words.  I'm not

13  sure how you're even going to search for complaints about the

14  topic that you, Mr. Ripin, have agreed to search for, meaning

15  the complaints about cardboard-box deposits.  I'm not sure if

16  those are kept in a particular way or in a particular filing

17  system or structure or if you are going to run a general search

18  using terms and connectors in a database or whatever you're

19  going to do.  This seems like one where there's some room

20  between cardboard box only, it has to use the word cardboard,

21  it has to use the word box.  It has to be some sort of magic

22  language that's only going to capture one or two complaints

23  versus any time anybody complained about a late delivery or the

24  delivery person acted unprofessionally or whatever, some

25  gigantic universe of complaints that will have absolutely no

1    bearing on what we're here to discuss.

2              So I'm not sure how we define that.  I mean, the term

3    that is used in the request is deposit practices.  That's a

4    capitalized term, I see, but I'm not sure I have the definition

5    of it.  Again, if there's some document that has the definition

6    and I've missed it, I apologize, but I don't know that I know

7    what the definition of deposit practice is.

8              So I could see that being a valid narrowing term,

9    assuming the definition is reasonable, if it has to do with the

10   cardboard deposits.  I mean, there's no dispute that that's

11   responsive.  But it has to do with bottle deposits generally or

12   why is this fee --

13             MR. RIPIN:  Bottle deposits generally, your Honor.

14             THE COURT:  Right.  So why is that too broad,

15   Mr. Ripin?  If it's limited to that and not the other nonsense

16   about whatever complaints your client may receive about all

17   kinds of things having to do with the widespread logistics and

18   delivery operation?

19             MR. RIPIN:  Your Honor, Manhattan Beer charges the

20   5-cent deposit, the state-mandated deposit pursuant to the

21   Bottle Bill, and there's the 10-cent deposit on cardboard

22   boxes, basically the issue in this lawsuit.

23             THE COURT:  Right.

24             MR. RIPIN:  And then there's a $30 deposit on kegs.

25   So there are three discrete deposits, if you will, that are

1    charged to customers.  The only one that's at issue in this

2    lawsuit is the 10-cent deposit on cardboard boxes.  They

3    alleged that it was a deceptive billing practice, in essence.

4            THE COURT:  I understand.  But they've also alleged

5    that it was hidden, that it wasn't itemized on invoice.  And

6    I'm not commenting on the veracity of those allegations, I

7    don't have any of the documents and it's at an early stage --

8    right? -- this case, but they've alleged that it was not

9    transparent to customers that they were being charged 10 cents

10   for a box deposit.

11           So the $30 keg deposit seems pretty distinguishable,

12   in part because it's a substantial amount, and also because

13   it's an entirely different -- I understand it's a container

14   that has beer in it, but other than that, it's fairly different

15   than the box and the bottle deposit.  So one could imagine

16   customers not fully appreciating -- again, this is the

17   allegation in the complaint, right, that customers didn't

18   appreciate that they were being charged this 10-cent deposit

19   and they wouldn't necessarily have known to complain about it

20   as the 10-cent, cardboard-box deposit, because that wasn't

21   something that was an itemized expense on their Manhattan Beer

22   Distributors invoice.

23           So it strikes me as too narrow to say, well, if the

24   customers didn't manage to figure out that they should be

25   complaining about a cardboard box deposit, then we're not going

1    to produce other documents about complaints.  Again, I think

2    there would be a perfectly reasonable and valid exclusion, a

3    carve-out of keg-related deposits, because that seems to me

4    different in kind, in part, because it's $30, I think you just

5    said, as opposed to 5 or 10 cents.  Someone is going to notice

6    that, I would think.  It's just a different kind of item.

7            But deposits, complaints about deposits, whether

8    they're bottle or box-related deposits, seem much more within

9    the realm of material likely to be reasonable, proportional to

10   the needs of the case, both in terms of the plaintiff's need

11   for understanding what customers were saying, and in terms of

12   the burden of -- proportionality burden on the defense side.

13           MR. RIPIN:  What I think we were objecting to, your

14   Honor, is the idea that there's going to be some fishing around

15   for new claims, as it were.  You know, that we didn't know

16   about this claim and we want to find out so we can bring a new

17   lawsuit, a new class action.

18           There's no allegation that Manhattan Beer failed to

19   charge the state mandated 5-cent deposit or that they failed to

20   collect it or refund it.  That's nowhere in the pleading.

21           I understand what your Honor is saying in terms of

22   the allegations.  I believe, that the searches that we would

23   conduct in response to this request and others would, in fact,

24   capture that sort of responsive document, if it were out there.

25           But we didn't want plaintiffs, you know, fishing

1  around for new claims.  If a customer claims that the -- that

2  they shouldn't have to pay a 5-cent deposit, or, you know,

3  something like that, that is -- certainly would not appear to

4  be relevant.

5        THE COURT:  Okay.  But, again, the problem that we

6  have is the allegation is that the fee itself, the 10-cent fee

7  was not transparently disclosed.  I mean, that's the entirety

8  of the case.  I mean, that's a very long complaint so there's

9  more to it than that, perhaps, but that's the crux of it.

10       And to the extent there are complaints that sort of

11 get at the issue maybe in a roundabout way, or why am I being

12 charged all these deposit fees, what's that about, I think

13 you're right, Mr. Ripin, that your searches likely would pull

14 that up as a responsive document or a potentially responsive

15 document.  But the way you narrowed your response to say you

16 would only produce documents that are regarding cardboard box

17 deposits, I'm not sure using my example if that's a document

18 you and your team would consider to be responsive but I think

19 that's a document that would have to be produced.  Because,

20 again, that allows the plaintiffs to evaluate whether the

21 company, the defendant, had knowledge of complaints or took

22 actions in response to those that might be relevant to the

23 overall claims and defenses.

24       So let me put it this way.  I think that to the

25 extent we're referring to the deposits and the deposits include

1    keg deposits, it shouldn't include that.

2              I don't think you're really intending to include

3    that, are you, Mr. McInturff?

4              MR. McINTURFF:  No, your Honor.  And I'll add that

5    the defined term deposit practices was the subject of much

6    discussion and has been adopted for, I would say, the lion's

7    share of the discovery request by defendant.  We were able to

8    reach agreement on the use of that term with respect to, you

9    know -- as part of the overall discovery.

10             So I don't think that it would be overly burdensome

11   if the defendant adopted that term for this particular set of

12   requests.  And when it comes to keg deposits, I think they

13   would fall out as not being relevant, but I will say one of

14   our -- one of the topics we're exploring in this area is the

15   company's knowledge about what customers knew about their

16   receipts.  I think it's fairly common knowledge that people

17   don't scrutinize their receipts, and that we would expect the

18   company to have documents about that more generally in terms of

19   communications about customers not appreciating what types of

20   deposit charges are there.  So that's why we developed this

21   term, deposit practices, and it's generally related to the

22   collection and billing for these deposits as required by the

23   Bottle Bill.

24             So again, I think the easiest course here is since

25   the defendant has adopted deposit practices, we would ask that

 1   they adopt it for this response, and if they run into anything

 2   that is overly burdensome, they reach out to us, because a

 3   bunch of emails about kegs doesn't do us any good either so --

 4            THE COURT:  Okay.  Mr. Ripin.

 5            MR. RIPIN:  Yes.  Just wanted to respond that a

 6   number of plaintiff's requests use the term 10-cent deposit,

 7   10-cent deposits.  In other words, the requests themselves

 8   distinguish between deposit practices, which is a broader term,

 9   intending to encompass -- it's defined so as to encompass --

10   encompass all of Manhattan Beer's deposits versus if you go

11   through the request you see a number of them are limited to the

12   10 cents.

13            THE COURT:  Okay.  But this one wasn't.  This one

14   uses the broader term.

15            MR. RIPIN:  This one was not, and that's the reason

16   for our objection with respect to this.

17            THE COURT:  I'm not suggesting that the objection

18   wasn't well taken, I just -- I'm overruling it.

19            So I'm going to require that the term deposit

20   practices be applied here because for all the reasons I have

21   said, I think it's likely to capture at least some information,

22   material that would be relevant to the claims here and I think

23   that, while there will be some additional burden on the

24   defendant in terms of conducting that search, I think it's

25   certainly well within the bounds of proportional to the needs

1   of the case.

2           I am excluding, though, from the responsiveness,

3   despite the point that Mr. McInturff just made, I am excluding

4   from the responsiveness, the production, any complaints that

5   are exclusively related to kegs, because that's just not

6   directly on point here or even close enough to being on point.

7           Take the broader idea, Mr. McInturff, that we're

8   talking about scrutinizing receipts generally, but that's

9   starting to get a few steps too far removed from the claims

10  that are really in dispute here.

11          So that broader -- the objection with respect to the

12  term deposit practices is overruled here and the search and

13  production should proceed in accordance with the contours that

14  I've laid out.

15          MR. RIPIN:  Judge, before we move to the next point

16  may I confer with counsel on one point?

17          THE COURT:  Sure.

18          (Pause)

19          MR. RIPIN:  Thank you, your Honor.

20          THE COURT:  Okay.  The next issue is with respect to

21  database data.  There are a couple of different categories when

22  it comes to that.  One is with respect to the interrogatories,

23  interrogatory number 5, seeking aggregate class-wide damages

24  data, including the number of customers charged, not received

25  and refunded, and customer complaint data.

1                There's also a request number 28 in the requests for

2       production that asked for all database data regarding -- well,

3       this is the way it's written in this document.  It says all

4       database data regarding that involves or touches on Manhattan

5       Beer's deposit practices, including field trees for all

6       databases.

7                I carved that out from the prior discussion about

8       discovery on discovery because it struck me as perhaps a bit

9       distinguishable, so we'll talk about that.

10               But in terms of the interrogatory number 5, one --

11      we'll just address this in pieces -- one part of the

12      defendants' objection which is respect to (f), 5(f), the number

13      of customers that who complained to Manhattan Beer regarding

14      deposit practices, I do find that to be outside the scope of

15      what's appropriate under Local Civil Rule 33.3(a).  I think

16      you're going to get that information essentially through what

17      we've just discussed in terms of the document production

18      regarding complaints.  So I am going to sustain the objection

19      with respect to 5(f) on that basis.

20               The argument about 5(f) being one interrogatory too

21      many.  I don't really think we need to get into an exercise of

22      counting the interrogatories at this point, since I've ruled

23      already that most of them would not require a further response.

24      I don't really want to get into a debate about the subparts and

25      whether those count as separate interrogatories.  I realize we

1    may need to have that discussion at some point down the line,

2    but I think we can defer that for today, unless somebody feels

3    very strongly about that.

4               Mr. Wittels or Mr. McInturff.

5               MR. McINTURFF:  No, that's fine.

6               THE COURT:  Okay.  Mr. Ripin.

7               All right.  With respect to the remainder of 5, this

8    also strikes me as something that is both potentially redundant

9    in light of the fact that there is going to be documentary

10   evidence produced in response to request number 3 that will

11   capture a lot of this information.  I think it's very close to

12   the line with respect to Local Civil Rule 33.3.  I don't think

13   I've ever seen an argument that the computation of damages

14   portion that's contemplated under Rule 33.3(a) as a basis for

15   interrogatories should be applied in the direction you're

16   attempting to apply it.  That's usually a category of

17   interrogatory that is directed at the plaintiff as to their

18   computation of damages.

19               I'm not saying it's wrong to say that that's a basis

20   for a damage computation as to the defendants, but that's

21   something I'd like to think about and research more, but I

22   don't think we need to do that here because there's going to a

23   production of data and a production of information that's going

24   to capture a tremendous amount of this information already in

25   response to the document demands.  So in that sense, the

document demand and the response, which is that defendant will

produce documents responsive to demand number 3, will already

provide a substantial amount of this information that's

requested in interrogatory number 5.

Mr. McInturff, do you want to try to explain to me

what I might be overlooking in terms of that?

MR. McINTURFF:  Yes.  If you could bear with me one

second.  I want (indiscernible).

Okay, so the -- let me back up and explain what we

need because -- and I think the Court understands what we need,

which is the actual data.

My understanding, though, is that the defendant is

not willing to produce the actual data.  My understanding is

why we ended up bringing this issue, your Honor, is that the

defendant will produce -- so in response number 3, those are

documents and communications regarding the data.  So that's

internal analysis of the underlying data.  Maybe one of those

documents was generated in 2018.  We can't build a damages

model off an internal communication.

In terms of interrogatory number 5, the defendants'

letter says we'll give you items A, B, C, and D, which we'd ask

for in database format, but the defendant says they will

produce documents reflecting items A, B, C, and D.  In other

words, document request number 3, an internal communication

analyzing aggregate data is critical to this case, but without

1   the underlying database data, we can't build a damages model.

2          THE COURT:  I understand the point.

3          Mr. Ripin.

4          It's just not clear to me that it should be framed as

5   an interrogatory, as opposed to a document demand.  I mean, you

6   could make a document demand for a database also.

7          Mr. Ripin, I'll come back to --

8          MR. McINTURFF:  If I could clarify, your Honor.

9          THE COURT:  Yes.

10          MR. McINTURFF:  We did make a document demand for a

11   database.  This interrogatory --

12          THE COURT:  Which document demand is that?

13          MR. McINTURFF:  I think it's 28 where we said all

14   database data regarding --

15          THE COURT:  Along with the field trees.

16          MR. McINTURFF:  Correct.

17          THE COURT:  Regarding that involves or touches on

18   Manhattan Beer's deposit practices including field trees for

19   all databases.

20          MR. McINTURFF:  If I could clarify.  We're

21   essentially -- we've got -- this case is really about this

22   receipt and this receipt has a bunch of data on it.  And so

23   we're asking for the data that they have in database format so

24   that we can work with it and build a damages model.

25          And we ask interrogatory number 5 in terms of

1   aggregate data at the moment primarily so that we can -- we

2   have a sense in the beginning of the case for settlement

3   purposes, but also for class certification purposes, that we

4   have a concrete admission about the number of potential

5   consumers involved at the initial part of discovery.

6          So that's why we ask for -- we ask for and typically

7   obtain tables showing 50,000 customers, whatever the number may

8   be.

9          THE COURT:  And why should that be for deposit

10  practices and not just for the cardboard box deposit?

11         MR. McINTURFF:  I don't believe it is broad for

12  deposit practices.

13         THE COURT:  Well, that's what 28 says.

14         MR. McINTURFF:  No, no, no.  Oh, oh, for the data.

15  Oh, because the data is basically a database and we want to

16  see -- again, what's on the receipt, the receipt has your keg

17  refund, it has your bottle refund, it has how many bottles you

18  bought.  We want the customer data so that we can analyze the

19  data.  So it is broader and more --

20         THE COURT:  I know that you want that, but why should

21  you have that for this case, which is about the cardboard-box

22  deposit?

23         MR. McINTURFF:  We don't -- like, for example, we

24  don't need the keg entry.  We haven't gotten there, because

25  what we asked for was the field trees so that we could

1    negotiate what's there because there's --

2              THE COURT:  I understand that.  That's fine.  You're

3    open to a discussion about what the scope of that should be.

4              MR. McINTURFF:  Correct.

5              THE COURT:  But your bottom line is you need to have

6    data.

7              MR. McINTURFF:  We need the data.

8              THE COURT:  I understand that.

9         Mr. Ripin, I don't see how you're not going to

10   produce data in this case.

11             MR. RIPIN:  We don't have an objection, your Honor,

12   to providing the aggregate data with respect to the 10-cent

13   deposit.  The total revenue received and the amount refunded,

14   those, I believe, are the crux of it and we don't have an

15   objection to that.  What we object to is the much broader --

16   you know, I'm not sure which request we're on now.

17             THE COURT:  We're sort of holding in both hands

18   interrogatory number 5 and request for production number 28,

19   which are, it seems to me, pretty related to one another, along

20   with request for production number 3.

21             MR. RIPIN:  So, I mean, 28 is about as broad as it

22   could possibly --

23             THE COURT:  I agree with that.

24             MR. RIPIN:  -- get.

25             THE COURT:  All database data is too broad.  It's

1  very broad.  But you just say you are not going to produce

2  anything which --

3          MR. RIPIN:  Right.

4          THE COURT:  -- seems too narrow.

5          MR. RIPIN:  So what we're willing to, as a

6  compromise, your Honor, we're willing to give them the data

7  with respect to the total revenue received and amount of money

8  refunded with respect to this 10-cent deposit, which is, I

9  think, what they're looking for.

10          THE COURT:  They're also looking for information

11  about the number of customers involved, which certainly seems

12  relevant in a putative class action.

13          MR. RIPIN:  Yeah, we don't have a problem with that.

14          THE COURT:  Okay.  We're negotiating it right in

15  front of my eyes, which is great in the sense of trying to

16  reach a compromise, but not great in the sense of it's not

17  really ready for me to make a final determination on.  Maybe

18  what I've said has helped motivate you to have a further

19  discussion, but I think you are going to have to go back to the

20  drawing board on this one a little bit because, look, 28 says

21  you're not going to produce anything.  Interrogatory number 5

22  says you object on various grounds.

23          The response to request for production number 3, as

24  interpreted by Mr. McInturff, and I think not unreasonably

25  interpreted that way, talks about producing documents or

1    electronically stored information and there's a concern that

2    that could be read to mean you weren't going to produce data in

3    a database format, whatever program that might be.

4          And so what I hear you saying, Mr. Ripin, is yes,

5    there are certain things that you acknowledge that Manhattan

6    Beer Distributors will have to produce, that you will have to

7    produce data and not just a summary Word document or PDF that

8    reflects that data, that you'll actually have to produce some

9    data in some form, but that you're not comfortable with the

10   breath of request number 28.

11         If that's your position, I think that's a reasonable

12   position, and then it's just a matter of figuring out exactly

13   what the parameters of that are, and I'm going to encourage you

14   to talk to each other about it as part of your ongoing

15   negotiations, and you'll report back if you get to an impasse,

16   but I think this gets us closer to at least an answer, closer

17   than where it seemed to be from the submissions here.

18         So I'm going to put that one back to you to discuss

19   further, but it feels as though we're making headway on that

20   one.

21         When it comes to the field trees, I will say, I don't

22   view that as discovery on discovery in quite the same way,

23   because if you wind up producing a database, at a minimum the

24   plaintiff should understand what the data is that they're

25   receiving.  That doesn't necessarily seem to me to suggest that

1  they should be able to receive the field trees of the entire

2  database recordkeeping system from Manhattan Beer Distributors

3  that covers all information that could possibly be captured.

4  That is getting closer to the discovery on discovery issue.

5           But if there's some sort of database that's going to

6  be produced extracted from a larger database because of

7  relevance and proportionality concerns, at a minimum, the

8  plaintiff should understand what those fields are that are

9  being produced.

10          Does that make sense, Mr. Ripin?

11          MR. RIPIN:  Could I just confer with my colleague?

12          (Pause)

13          THE COURT:  Absolutely.

14          MR. RIPIN:  Yes, your Honor.

15          THE COURT:  All right, I believe that that covers

16  everything that was in the letters.

17          I'm just looking at my notes.  I have checked off

18  everything, but I'm not 100 percent sure that I have that

19  right, so let me turn back to you.

20          Have I overlooked anything inadvertently,

21  Mr. McInturff?

22          MR. McINTURFF:  No, your Honor.

23          THE COURT:  Mr. Ripin?

24          (Pause)

25          MR. RIPIN:  I think we're covered, your Honor.

1          THE COURT:  Okay.  For my benefit and for yours, I am

2     going to direct that you order the transcript.  We spent an

3     hour talking about these things.  There are going to be nuances

4     and we may have further debate about what I meant, or what you

5     meant, when we said certain things today.  So please order the

6     transcript.  You can split the cost.  I'll leave it to your

7     good judgment as to how quickly you need to have it, whether

8     that's overnight to inform your discussions this week or I

9     think it's --

10          I always forget this, Ms. Brown.  It's overnight, 3

11     days, 7 days, 14 days, right?  Or am I making up the 3 days?  I

12     know there's a 7, 14, and 30-day option, and a next day option.

13          We've given away a lot of those papers recently.

14     People have been ordering a lot of transcripts.

15          Here it is.

16          THE DEPUTY CLERK:  It's 1 to 3.

17          THE COURT:  1 to 3.

18          THE DEPUTY CLERK:  7, 14, and 30.

19          THE COURT:  Okay.  So obviously you're familiar with

20     these forms and the escalating expenses associated with them.

21     So I do leave it to you to decide whether you need it in 1 to 3

22     or you need it in 7 seven or you need it in 14 in order to

23     facilitate your discussions.  There are a lot of people here,

24     people taking good notes, but nevertheless, we'll have the

25     transcript because experience has taught me that we're going to

1  probably need to refer back to it at some point and that way

2  we'll have it when we need to do that.  Once you do get it,

3  please send a copy to my chambers' email address so that we can

4  put it in our file as well.

5          All right, the next deadline you have in this case is

6  Friday to submit the ESI protocol.  I know you're still working

7  on issues and it may be that you'll get to a point where you

8  don't have any outstanding disputes, but it sounds like there

9  may be some disputes still, and there are a couple of follow-up

10  items here that are going to require further negotiation that

11  may ripen into disputes so that we can continue to move this

12  forward and make sure you can stay on your May through August

13  production schedule.  I'd like to have you back in for another

14  conference soon.  Probably the week of May 8 to discuss any

15  disputes that may still exist after Friday, so that would give

16  you about a week to negotiate -- give you the rest of this week

17  to negotiate on the ESI protocol, to tee up any disputes that

18  you may have there, and to continue to negotiate on these two

19  issues in particular that I've sent back to you, and then to

20  refine whatever objections or ongoing issues there might be

21  with respect to those.

22          So I'm going to look for an in-person conference the

23  week of May 8.  We'll see what works best.  I can do Monday

24  morning, the 8th.  Obviously, that shortens the meet and confer

25  process a bit, so I would be inclined to do maybe Wednesday the

1   10th or Friday the 12th, if those are possibilities for all of

2   you.

3           On the plaintiff's side, any preference?

4           MR. McINTURFF:  I have to apologize, your Honor.  I

5   had to give up my phone, so I can't see my calendar, so

6   whatever your Honor --

7           THE COURT:  Okay, we'll make pick a date, and then if

8   it doesn't work, you'll let me know.  What we'll do is, we'll

9   pick a date, and if it winds up not working when you get

10  downstairs, you just talk to each other and propose some

11  alternatives.  We'll figure it out.

12          Mr. Ripin, do you have any sense of your calendar

13  that week or do you have the same problem?

14          MR. RIPIN:  Working at the same disadvantage as

15  Mr. McInturff.

16          THE COURT:  Good enough.

17          All right.  So we're going to put this down then for

18  May 10 at 11:00 a.m., that's Wednesday.  We'll do it in the

19  same courtroom.

20          The only reason I had said to you that we didn't know

21  which courtroom we were going to be using is there was a

22  possibility that one of the other judges was going to be

23  conducting a trial here because there was a very lengthy

24  criminal trial that was being conducted in that judge's

25  courtroom, because the judge who was conducting that trial, his

1    courtroom is being redone.  It's more detail than you need to

2    know.  But just so you know, this is my courtroom and this is

3    the default location for any conferences with me.  There was

4    just that weird wrinkle for this particular conference, which

5    is why we had to reach out last week about it.

6              In any case, May 10, 11 a.m.

7              We'll have letters with disputes due, affirmative

8    letters you should submit by May 4.  That will give you as much

9    time as possible to get these issues resolved and work through

10   as many things as you can.

11             And affirmative letters, as you did last time.

12   Affirmative letters can come from nobody, one party, or both

13   parties, depending on who has disputes to raise and then

14   responsive letters on May 8.

15             So that's the 4th, which is a Thursday, and the 8th,

16   which is a Monday; 4th for the affirmative, the 8th for the

17   responsive.

18             And again, I'll look for your ESI protocol by the

19   28th, although now that we have this schedule set up, if you

20   tell me that you would like to have a couple extra days until

21   say, May 2nd or 3rd, if that would facilitate negotiations, I'm

22   happy to give that you to and I can do it right now.

23             MR. McINTURFF:  I think we're okay.  I mean, I've got

24   like -- I'm just waiting for a call back from our expert.

25             We're really close.  I don't think we need to --

 1                THE COURT:  Okay.  Well, again, if something changes,

 2      we can extend that by a couple of days without upsetting the

 3      rest of the schedule.

 4                So we'll keep that date, April 28 for the ESI

 5      protocol, May 4 for affirmative dispute letters regarding

 6      anything, but I would expect it to be the ESI protocol and the

 7      outstanding issues we talked about today, and then responsive

 8      letters by May 8.

 9                MR. RIPIN:  I'm sorry to interrupt.  I guess on the

10      ESI protocol, which is due Friday, to the extent we have

11      impasse issues, which we'll then --

12                THE COURT:  Tee up on May 4, yes.

13                MR. RIPIN:  Should we submit the ESI protocol as to

14      the non-disputed matters on Friday or what's the best procedure

15      with respect to that?

16                THE COURT:  You're not going to want me to sign a

17      partial protocol, though, right?

18                MR. RIPIN:  Right.

19                THE COURT:  So I mean, if there are disputed

20      matters -- it doesn't really matter, I guess.  I think you

21      might as well just go ahead and submit -- this is partly why I

22      was suggesting rolling it over a couple of days, just to give

23      you a little bit more time.

24                MR. RIPIN:  It may make more sense to do it that way.

25                THE COURT:  All right, so why don't we extend the

1   date for the ESI protocol to May 4.  I appreciate the question,

2   Mr. Ripin.  That was a better way of capturing the concern I

3   was trying to get at myself.

4          So we'll make May 4 a deadline for the ESI protocol.

5   If it turns out to be no issues, then great.

6          Yes, let's do it this way, just so it's not a moving

7   target.  We'll make the ESI protocol due May 3, and that way,

8   if you have any issues, you'll know what they are and you can

9   include those in the letter on May 4.  Okay?

10          I don't want there to be some question about have you

11   reached an end of your negotiation.  I don't expect that to

12   happen, but sometimes that can be a little confusing when you

13   have too many overlapping dates.

14          So we'll make the ESI protocol May 3, any disputes

15   regarding that or anything else by affirmative letters May 4,

16   responsive letters May 8, and our next conference May 10 at

17   11:00 a.m. subject to you checking your calendars and letting

18   me know if that turns out to be a problem.  If it is a problem,

19   one other possibility for me would be the 12th, the Friday, in

20   the morning.  That's wide open for me at the moment.

21          MR. RIPIN:  I apologize.  Just so that I'm clear.  On

22   May 3, assuming there are impasse items on the ESI protocol --

23          THE COURT:  You should submit one document that

24   has -- this is how I handle, for example, jury instructions.

25   Right?  It's a joint document where your competing proposals

1    are reflected in the same document.

2              So if sections 1 through 9 are agreed upon, that's

3    great.  Then paragraph 10 can show me plaintiff's proposal and

4    defendants' proposal.  Then 11 through 14 are agreed upon.  And

5    15 can show me plaintiff's proposal and defendants' proposal.

6              If you want to annotate those using comment bubbles

7    and tract changes, that's fine, there are a lot of different

8    ways to do it, as long as I can look at one document and see

9    both parties' positions and whatever objections you may have.

10   It may be that it's just an objection to a particular word, you

11   know, the word "not," or "large" or whatever it is, you can

12   highlight that and put it in a comment bubble instead of

13   reproducing an entirely near identical paragraph with just one

14   word changed.

15             So I'll leave it to your good judgment as to how to

16   present it, as long as it's comprehensible to somebody who

17   hasn't been sitting in on all of your negotiations over the

18   past several weeks.

19             Does that make sense?

20             MR. RIPIN:  Yes.  Thank you.

21             THE COURT:  Okay.  Thank you for the clarification,

22   Mr. Ripin.

23             All right.  With that said, is there anything further

24   that we should address today from the plaintiff's perspective,

25   Mr. McInturff?

1          MR. McINTURFF:  No, your Honor.  Thank you.

2          THE COURT:  From the defendants' perspective,

3   Mr. Ripin?

4          MR. RIPIN:  No, your Honor.

5          THE COURT:  Okay.  We'll be back together in a couple

6   of weeks.  I'll look forward to your letters before then, and

7   if there's anything that requires more urgent attention, you'll

8   let me know.  Okay?

9          MR. RIPIN:  Thank you, your Honor.

10          THE COURT:  We'll stand adjourned for today.

11          Thank you.

12          MR. McINTURFF:  Thank you.

13                        o0o